COMMONWEALTH *vs.* RICHARD MAHAR.

Suffolk. December 6, 1999. - January 25, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Home Invasion. Armed Assault with Intent to Rob. Evidence,* Spontaneous utterance, Impeachment of credibility, Credibility of witness, Hearsay, Prior inconsistent statement. *Practice, Criminal,* Instructions to jury. *Words,* "Entry."

At the trial of an indictment for ·armed home invasion, G. L. c. 265, § 18C, the evidence presented warranted the jury's finding that the defendant's entry into the dwelling was unlawful [646-647]; and there was no basis in the evidence to warrant an instruction to the jury addressing whether the entry was lawful because of consent or privilege [650-653].

At the trial of an indictment for armed assault with intent to rob, G. L. c. 265, § 18 (*b*), the Commonwealth's evidence was sufficient to establish that the defendant had the specific intent to rob another; however, the evidence also warranted an instruction to the jury that the defendant may have harbored a reasonable and honest belief that the money he demanded was his; where the judge did not so instruct, the defendant was entitled to a new trial on that indictment. [647-648]

This court adopted rule 806 of the Proposed Massachusetts Rules of Evidence, permitting the impeachment of a nontestifying declarant's credibility by any evidence that would have been admissible if the declarant had testified. [649-650]

Where, at the trial of indictments, the incriminating statement of a nontestifying victim was admitted under the excited utterance exception to the rule against hearsay, subsequent inconsistent statements of the victim bearing on her credibility offered to impeach her should have been admitted and would have been admissible under Proposed Mass. R. Evid. 806 [648-649]; the judge's exclusion of the evidence was not prejudicial, in the circumstances, in light of the Commonwealth's substantial proof of the defendant's guilt, including his own admissions [650].

INDICTMENTS found and returned in the Superior Court Department on March 3, 1997.

The cases were tried before *Thomas E. Connolly,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Nona E. Walker,* Committee for Public Counsel Services, for the defendant.

*Paul B. Linn*, Assistant District Attorney (*Peter G. Flaherty, II*, Assistant District Attorney, with him) for the Commonwealth.

GREANEY, J. Based on an incident that occurred at about 6 P.M. on March 3, 1997, at the house at 528 Metropolitan Avenue in the Hyde Park section of Boston, a jury in the Superior Court convicted the defendant of armed home invasion, G. L. c. 265, § 18C; armed assault with intent to rob, G. L. c. 265, § 18 (*b*); several other assaults[1]; and wilful and malicious injury to an automobile, G. L. c. 266, § 127. The defendant, represented by new counsel, has appealed from his convictions, and we transferred his appeal to this court on our own motion.

We reject the defendant's argument that his motions for required findings of not guilty on the armed home invasion and armed assault with intent to rob charges were improperly denied. We accept the Commonwealth's concession that the lack of a pertinent jury instruction requires reversal of the defendant's conviction of armed assault with intent to rob. We shall adopt rule 806 of the Proposed Massachusetts Rules of Evidence and conclude that the judge's refusal, consistent with the rule, to admit impeachment evidence offered by the defendant did not prejudice his case. Finally, we conclude that the defendant was not improperly denied a requested jury instruction in connection with the entry element of the crime of armed home invasion.

Based on the Commonwealth's evidence, the jury could have found the following facts. On March 3, 1997, Sandra MaGrath picked up her friend, Gina Venteroso, the defendant's girl friend, and took Venteroso to her house at 528 Metropolitan Avenue. Several people resided at MaGrath's house, including her four children; her boy friend, Richard Coote; and her uncle, Joseph Ventola. MaGrath knew of the defendant because he was a friend of the father of one of her sons, Edward Goss, but she did not know the defendant personally and was not his friend. Coote knew the defendant, but "never hung out with him or nothing." Ventola hardly knew the defendant, but did know who he was.

At approximately 6 P.M. that day, MaGrath and Goss were in her kitchen. Goss was behind a door talking on the telephone.

---

[1]These include convictions on two indictments charging assault by means of a dangerous weapon, G. L. c. 265, § 15B (*b*); and one indictment charging assault and battery, G. L. c. 265, § 13A. The latter conviction was filed with the defendant's consent and is not before us. See *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975).

Ventola was in the bathroom, and Venteroso, Coote, and the children were in the living room. The outside door leading into the kitchen was open, and the storm door was closed. To open the storm door, one would have to press a button on the handle and then push on the door.

MaGrath heard a knock on the storm door, looked up, and saw the defendant. He asked for Venteroso. (The top panel of the door was glass which allowed the defendant to be seen by anyone in the kitchen.) MaGrath called Venteroso, and she came into the kitchen. The defendant then opened the storm door and barged into the kitchen with a machete in his hand. The defendant grabbed Venteroso by her shirt, held the machete up to her neck, and said she owed him money. The defendant grabbed Venteroso by her hair and bounced her off the wall and door. The defendant, with the machete raised over his head, told Venteroso that he "was going to chop her" and repeatedly told her that he was going to kill her. The defendant assaulted Venteroso, exclaiming, "I want five hundred dollars," or, "Give me my five hundred dollars." He also threatened Ventola with the machete, saying that, if he moved, the defendant would strike him with the machete.

The defendant dragged Venteroso out of the house by her hair and down three stairs to the ground. While outside, the defendant broke the kitchen storm door window with the machete, jumped up and down on the hood of one of Ventola's automobiles, and used the machete to smash all of the windows of another vehicle owned by Ventola. When Ventola came outside, the defendant jumped in his automobile and tried to run Ventola over.

Shortly after the defendant left, the police arrived. The telephone rang, and Ventola answered it. The defendant was on the line and told Ventola, "That was step one and we're going to go to step two." Ventola handed the telephone to Officer Kevin Doogan of the Boston police department, who took the telephone and heard a male voice say, "I'm going to chop all of yous, and no one is going to get . . . anyone that gets in the way of me and my money I'm going to f'n kill."

Officer Doogan spoke with Venteroso, who was crying hysterically and having difficulty breathing. Venteroso's hair and clothes were disheveled. She had red welts on her face and neck, and she had a bleeding injury to her left ring finger at the knuckle. Venteroso told Officer Doogan what had happened to

her. She explained that she had received a settlement check, and that the defendant wanted some of the money she had received.

The police arrested the defendant. While being transported to the police station, the defendant stated to the police, "You ain't never going to find that mother-fucking machete; I made sure of that," and, "The machete is nice and safe. It will come out when I get out." (The machete was never found.) The defendant also stated, "Those people . . . will never testify against me. I put the fear of God into them." Later at the police station, the defendant stated that, when he came out, "there would be more than one beef."

1. We first decide the defendant's claims concerning his motions for required findings of not guilty on the armed home invasion and armed assault with intent to rob charges.

(a) General Laws c. 265, § 18C, defines the crime of armed home invasion as follows: "Whoever knowingly enters the dwelling place of another knowing or having reason to know that one or more persons are present within or knowingly enters the dwelling place of another and remains in such dwelling place knowing or having reason to know that one or more persons are present within while armed with a dangerous weapon, uses force or threatens the imminent use of force upon any person within such dwelling place whether or not injury occurs, or intentionally causes any injury to any person within such dwelling place shall be punished . . . ." The defendant focuses on the entry element of the crime and argues that he was entitled to a required finding of not guilty because the Commonwealth's evidence did "not make out a nonconsensual entry; indeed [the evidence] indicates that the defendant's entry into the house was consensual." To support his contention, the defendant principally relies on *Commonwealth* v. *Dunn*, 43 Mass. App. Ct. 58 (1997). There, the Appeals Court discussed a contention that G. L. c. 265, § 18C, "fail[ed] to distinguish a lawful from an unlawful entry." *Id.* at 60. The court stated: "The term 'enters' within the statute is given no special definition. Nonetheless, the word is to be construed as an unlawful entry, consistent with its use in a criminal context. See Black's Law Dictionary 533 (6th ed. 1990) ('In criminal law, entry is the unlawful making [of] one's way into a dwelling or other house, for the purpose of committing a crime therein'). See also *Commonwealth* v. *Ricardo*, 26 Mass. App. Ct. 345, 355 (1988) (for purposes of armed assault within a dwelling, G. L. c. 265,

§ 18A, entry must be 'unprivileged' or unlawful). Indeed, the act's very caption — 'An Act Establishing the Crime of Home Invasion' — bespeaks legislative intent that a *consensual* or privileged entry is not an 'invasion.' '' (Emphasis added.) *Id.* Thus, the Appeals Court concluded that the word "entry" in the statute "contemplates the common law meaning of an unlawful, or *nonconsensual* entry" (emphasis added). *Id.* The Commonwealth argues that the evidence, considered under governing standards, see *Commonwealth* v. *Martino*, 412 Mass. 267, 272 (1992); *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), was sufficient to prove an unlawful entry. We agree.

While there was evidence that the defendant opened the storm door and came into the house only after Venteroso had been called and had come into the kitchen, Venteroso told Officer Doogan that the defendant "barged" into the kitchen. There was no evidence the defendant was an occupant of the house, and no evidence that the defendant was accustomed to entering the dwelling without explicit permission. The evidence indicates that the defendant purposely hid the machete from sight when he came to the storm door, so he would not be prevented from entering. As we shall explain in more detail in Part 3 of this opinion, this is not a case in which the defendant could properly assert that his entry was consensual. On the Commonwealth's evidence, the jury permissibly could find that his entry was unlawful.[2]

(b) General Laws c. 265, § 18 (*b*), defines the crime of armed assault with intent to rob as follows: "Whoever, being armed with a dangerous weapon, assaults another with intent to rob or murder shall be punished . . . ." An essential element of this crime is that the defendant had a specific intent to rob. A defendant lacks the requisite intent if he has an honest and reasonable belief that he took his own property. See *Commonwealth* v. *White*, 5 Mass. App. Ct. 483, 488 (1977). The defendant argues that he was entitled to a required finding of not guilty because the Commonwealth's proof was insufficient to establish that he had a specific intent to rob Venteroso, as "there was no evidence indicative of the defendant's intent to do anything other than recover his own money." Again, we disagree.

---

[2]The defendant renewed his motion for a required finding of not guilty on the armed home invasion charge at the close of all the evidence. The judge correctly denied the renewed motion. See *Commonwealth* v. *Basch*, 386 Mass. 620, 622 & n.2 (1982).

There was evidence that Venteroso told Officer Doogan that she had received a settlement check and that the defendant had claimed some of the proceeds. Venteroso also told Officer Doogan that the defendant had a machete and attacked her. Coote testified that he heard the defendant demanding money from Venteroso. As mentioned previously, while the defendant made his demand, he grasped Venteroso by her hair with one hand and held the machete over his head with his other hand. The fact that the defendant resorted to violence with the machete to force Venteroso to give him money is some indication that he had no right to the money. From that inference, coupled with Venteroso's statement to Officer Doogan that she had received a check and other evidence, the jury could have inferred that the defendant intended unlawfully to take Venteroso's money and, thus, had the requisite intent to rob.[3]

The Commonwealth acknowledges, however, that, considered as a whole, the evidence was sufficient for the jury to conclude that the defendant may have harbored a reasonable and honest belief that the money he demanded from Venteroso was lawfully his, and, as a consequence, that the jury should have been given an instruction explaining the legal effect of such a finding on their assessment of the Commonwealth's proof of the defendant's guilt. In the absence of the instruction, the Commonwealth concedes (and we accept the concession) that the judgment of conviction on the armed assault with intent to rob charge must be reversed. See *Commonwealth* v. *Gelpi*, 416 Mass. 729, 730-731 (1994).

2. Venteroso did not testify at trial. Her version of the incident was admitted, over objection, through the testimony of Officer Doogan, who recounted to the jury what Venteroso had told him immediately after the incident. Venteroso's statements were admitted under the excited utterance exception to the hearsay rule, and are not challenged on appeal. The defendant's trial counsel sought to impeach Venteroso's credibility by means of her subsequent inconsistent statements. The defense evidence included statements given by Venteroso to the defendant's private investigator indicating that what she had told the police was "out of proportion," and "there was more to the story." In

[3]The defendant also renewed his motion for a required finding of not guilty on the armed assault with intent to rob charge at the close of all the evidence. The judge correctly denied the renewed motion. See *Commonwealth* v. *Basch*, *supra*.

particular, Venteroso denied that the defendant had hit her or carried a machete. Venteroso also testified on the defendant's behalf at a probation surrender hearing on unrelated charges. At that hearing, while under oath, she denied that the defendant had assaulted her with a machete and also denied telling the police that the defendant had attacked her. After hearing arguments of counsel on the defense offer, the judge excluded the impeaching evidence.

The evidence was not hearsay because the statements were not offered for their truth, but rather were offered to impeach Venteroso. The evidence bore on Venteroso's credibility and should have been admitted. It would have been admissible under Proposed Mass. R. Evid. 806, which reads as follows:

> "When a hearsay statement, or a statement defined in [other hearsay rules and principles], has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with his hearsay statement, is not subject to any requirement that he may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine him on the statement as if under cross-examination."

The defendant asks that we adopt rule 806 consistent with our statement in *Flood* v. *Southland Corp.*, 416 Mass. 62, 70 (1993), that we would consider "on a case-by-case basis . . . the adoption of principles set forth in the Proposed Massachusetts Rules of Evidence." We now accept the principles of proposed rule 806.

Our proposed rule is based on rule 806 of the Federal Rules of Evidence, which has long permitted the credibility of a declarant of a hearsay statement to be impeached by any evidence that would have been admissible if the declarant had testified, even if the declarant had no opportunity to deny or explain the impeaching evidence. We previously have cited the rule with favor, see *Commonwealth* v. *Sellon*, 380 Mass. 220, 224 n.6 (1980), and in *Commonwealth* v. *Pina*, *ante* 66, 74-77

(1999), we applied proposed rule 806, "in the circumstances of this case," to allow impeachment by prior inconsistent statement of a hearsay declarant's statement against penal interest. A Massachusetts commentator on the law of evidence has described proposed rule 806 as "essentially consistent with common practice." P.J. Liacos, Massachusetts Evidence § 8.4. 3, at 481 (7th ed. 1999). The rule complements our law governing the admission of excited utterances. It is intuitively logical to conclude that, if a live witness's substantive testimony can be properly impeached by prior inconsistent statements or other evidence, the same testimony admitted through an exception to the hearsay rule ought to be subject to the same impeachment. Otherwise, the fact finder is given a distorted and incomplete view of the evidence in a case where hearsay testimony that could be, but is not, impeached, is admitted. There is no reason to put a proponent of an absent witness in a better position than a proponent of a live witness. Proposed rule 806 provides for consistency of practice, and the admission of relevant evidence, without regard to the source of the evidence which is sought to be challenged or rehabilitated. Trial judges, of course, retain the authority to apply to evidence offered under proposed rule 806 rules and principles of evidence that might lead to the exclusion or limitation of evidence, just as they could if the evidence had been offered against the witness had he or she taken the stand.

The defendant's trial counsel did not cite proposed rule 806 to the judge when arguing for admission of the impeaching evidence, but defense counsel's argument tracked the substance of the rule. The defendant is entitled to have his appeal decided as if the judge's ruling constituted error. In deciding if the error was prejudicial, we inquire whether it "possibly weakened [the defendant's] case in some significant way so as to require a new trial." *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983). Evidence of Venteroso's retractions could have had little, if any, effect on the jury. The starkness and brutality of the defendant's assaults on her were recounted by several eyewitnesses. The defendant had implicated himself in the crimes and the use of the machete by incriminatory statements. The Commonwealth's proof was substantial. The excluded impeachment evidence provides no basis to order a new trial on any of the charges.

3. In his own case, the defendant presented testimony from Edward Goss, who was a visitor at the house when the incident occurred. Goss testified that after hearing a knock, he saw the

defendant at the storm door, and responded to the defendant's request to come in by opening the door and allowing the defendant to walk inside the house. The defendant's trial counsel, relying on *Commonwealth* v. *Dunn*, 43 Mass. App. Ct. 58 (1997), requested in writing that the judge instruct the jury that, on the armed home invasion charge, the "entry must be unlawful, that is to say *not* consensual or privileged [and] [i]f [the defendant] was permitted to enter the house by a lawful occupant then such entry was 'lawful' " (emphasis in original). The judge declined to give the instruction. Instead, the judge, during his initial charge, instructed the jury that they had to find beyond a reasonable doubt that "the defendant entered the dwelling place of another," and that "[a]n entry is an unlawful making of one's way into a dwelling." After the initial charge was completed, the judge told the jury, just before deliberations commenced and in clarification of his earlier instruction, that "[i]n criminal law entry is the unlawful making of one's way into a dwelling or other house for the purposes of committing a crime therein." The defendant's trial counsel preserved objections to the judge's instructions and to the judge's denial of the requested instruction. Defense counsel also preserved an objection to a portion of the prosecutor's closing argument, which she maintained gave the jury a misleading and prejudicial view of the entry element. The defendant now argues that he is entitled to a new trial on the armed home invasion charge because the judge erred by failing to define properly the element of "entry," and the alleged error was exacerbated by the prosecutor's closing remarks. We disagree.

As the Appeals Court points out, G. L. c. 265, § 18C, the armed home invasion statute, does not define the term "enters." *Commonwealth* v. *Dunn, supra* at 60. The statute is clearly designed to protect occupants of a dwelling from the kind of incident that occurred here — entry by an armed person who, once inside, assaults and traumatizes the occupants by attacking them with a machete. The gist of the entry element is to make an entry unlawful if the armed person has no right to enter the dwelling, possesses the requisite knowledge (of the presence of one or more persons inside), and commits an assault, or intentionally causes injury.[4] There may be occasions where a

---

[4]General Laws c. 265, § 18C, does not require that a person entered the dwelling with the specific intent to commit a crime therein.

consensual or privileged entry may be lawful, and, thus, not an entry for purposes of the statute.[5] See *id.* A defendant who puts forth evidence that he has entered a dwelling with permission in the past, so that a basis exists for a reasonable belief that he had a right to enter, may, if the entry was otherwise lawful, be entitled to a jury instruction addressing whether the entry was lawful because of consent or privilege. See *Commonwealth* v. *Fleming,* 46 Mass. App. Ct. 394, 396 (1999).[6] A consensual entry, however, does not always correlate with a lawful entry. When consent to enter is allegedly given to someone, in circumstances such as presented here, the purported consent cannot be considered legally significant unless the occupant has been made aware that the person at the door is armed with a dangerous weapon and is about to commit an assault once

---

[5] In *Commonwealth* v. *Robbins,* 422 Mass. 305 (1996), we interpreted the entry element for G. L. c. 266, § 14, armed burglary, and held that the defendant, who presented evidence that he had lived in the dwelling where the crime took place, was entitled to a jury instruction that, to find the defendant guilty, the jury must find that "the defendant knew that he had no right to enter . . . that premises." *Id.* at 315. In the instant case, the defendant does not argue that he had a legal right to occupy the premises. Further, we do not consider the term "enters" as used in the burglary statutes entirely the same as the term "enters" for purposes of the crime of armed home invasion.

[6] In *Commonwealth* v. *Fleming,* 46 Mass. App. Ct. 394, 397 (1999), the Appeals Court reversed a defendant's conviction under G. L. c. 265, § 18A, armed assault in a dwelling house, because the jury had not been instructed that, if they found the defendant had permission or privilege to enter the dwelling, his entry was not unlawful. The judge had told the jury only that, to convict, they must find that the premises were not the dwelling of the defendant and that he had no right of habitation or occupation at the time of entry. See *id.* at 396. The Appeals Court observed that, "[i]nherent in the idea of criminal [entry] is an unwarranted intrusion, one that the actor was not privileged or licensed to make." *Id.* Although the defendant in *Fleming* had let himself into a residential care facility (for mentally retarded persons) through an unlocked door, there was evidence that the defendant was a frequent guest of the overnight counsellor there, so a jury could have found that his entry was permitted through cumulative practice. See *id.* There was also evidence that the defendant did not enter with an unlawful purpose, as it was some time after his entry that an argument between the defendant and the occupants escalated into physical violence. See *id.* at 395. Thus, while the defendant's subsequent acts of beating one occupant and drawing his pocketknife on another were unlawful, a jury could find that his initial entry into the dwelling was not. The crime of armed home invasion is not intended to encompass situations where an invited guest in a home suddenly turns violent.

inside.[7] For practical purposes, permissive entry into a dwelling, and entry while armed in order to commit an armed assault, are mutually exclusive concepts because G. L. c. 265, § 18C, implies, as a matter of public policy, that an occupant of a dwelling cannot consent to allow an armed intruder like the defendant inside to commit an assault.[8] Cf. *Commonwealth* v. *Appleby*, 380 Mass. 296, 310 (1980) (public policy underlying G. L. c. 265, § 15A, requires that consent cannot be a defense to an assault and battery by means of a dangerous weapon).

The prosecutor's comments during closing argument, that if the defendant entered the house with a machete "to go over and assault Gina Venteroso and get money from her," then he committed an unlawful entry, even if the "doorman from the Ritz Carlton" had opened the door for him, do not aid the defendant's cause. While the remarks were a bit dramatic, they were close to the truth. The evidence here permitted only one inference — that when Goss acquiesced in the defendant's request for admittance, Goss was not aware that the defendant carried a machete, hidden from sight, that he was about to wield on Venteroso or any other person who impeded his mission. Thus, giving Goss's testimony full credit, as we must, there was no basis in law to warrant an instruction on consent. The judge's instructions corresponded with the evidence, including the evidence most favorable to the defendant, and they provide no reason to order a new trial on the armed home invasion charge.

4. The judgment of conviction of armed assault with intent to rob is reversed, the jury verdict on that charge is set aside, and the charge is remanded to the Superior Court for a new trial. The judgments of conviction on the other indictments that are before us, see note 1, *supra,* are affirmed.

*So ordered.*

---

[7] While there was testimony from Goss that he opened the door for the defendant and permitted the defendant to enter, there was no evidence that Goss was aware that the defendant was armed with a machete.

[8] It is worth noting here that the legislation from which G. L. c. 265, § 18C, derived initially defined the entry element in these terms: "Whoever, without authority, knowingly enters the dwelling place of another . . . ." 1993 House Doc. No. 4837. In enacting the statute, the Legislature struck the words "without authority." St. 1993, c. 333.