## COMMONWEALTH *vs.* STEVEN M. PUTNAM.

No. 07-P-958.

Worcester. April 7, 2009. - October 19, 2009.

Present: COHEN, KATZMANN, & GRAINGER, JJ.

*Home Invasion. Armed Assault in a Dwelling. Practice, Criminal,* Instructions to jury, Duplicative convictions.

At a criminal trial, there was sufficient evidence of an unlawful entry to sustain the convictions of home invasion and armed assault in a dwelling. [476-478]

At a trial of indictments charging home invasion and armed assault in a dwelling, the judge's instructions regarding consent to enter a dwelling properly informed the jury that consent to enter is negated if the Commonwealth establishes that an occupant purporting to consent to entry is either unaware that the person entering is armed, or aware that the person is armed, but unaware that the person intends to commit a crime once inside. [478-480]

A criminal defendant's conviction of armed assault in a dwelling was not duplicative of his conviction of home invasion, where the scienter requirement of the crime of home invasion distinguishes it from the crime of armed assault. [480-481]

INDICTMENTS found and returned in the Superior Court Department on April 16, 2004.

The cases were tried before *Francis R. Fecteau*, J.

*Debra S. Krupp*, Committee for Public Counsel Services, for the defendant.

*Donna-Marie Haran*, Assistant District Attorney, for the Commonwealth.

KATZMANN, J. Having been convicted by a Superior Court jury of home invasion, in violation of G. L. c. 265, § 18C; and armed assault in a dwelling, in violation of G. L. c. 265, § 18A, the defendant Steven M. Putnam now appeals.[1] He contends

---

[1] The defendant does not appeal his convictions of rape, in violation of G. L. c. 265, § 22(*a*); and assault and battery, in violation of G. L. c. 265, § 13A.

that the convictions must be reversed because the evidence was insufficient to prove that he entered the alleged victim's home unlawfully, and because the instruction on consent to enter was erroneous. He also claims that his conviction of armed assault in a dwelling must be reversed because it was duplicative of the home invasion conviction. We affirm.

*Background.* We view the evidence in the light most favorable to the Commonwealth. *Commonwealth* v. *Nolin,* 448 Mass. 207, 215 (2007). The victim, a self-employed counseling psychologist, lived on Old Mill Road in Harvard. Old Mill Road is a two-lane road with fields and woods, as well as isolated houses in the surrounding area. The victim's nearest neighbors were Anne Marie Arnold and Hank Emerson, who lived together about one-eighth of one mile down the road, on a working farm. The defendant lived on Arnold's property in an apartment across from the main house. He worked on the farm as a handyman and a helper.

The victim first met the defendant in 2001 at a block party. In 2002, the victim paid the defendant to clean leaves from her roof and her gutters. Around the same time, they had a few brief conversations. The victim occasionally saw the defendant on Arnold's property.

The day after Thanksgiving in 2003, in the early evening, the defendant knocked on the victim's front door and asked to come into her house. He appeared upset and intoxicated. After she allowed him in, the defendant asked the victim for help; he told her that he had been drinking and doing drugs and that he was not taking his medication. The victim told the defendant to stop drinking, to stop doing drugs, and to take his medication. The defendant then rambled on for about one-half hour; the victim thought the defendant was asking for her professional opinion but she did not give him one. The victim tried to bring the conversation to a close; the defendant eventually left. The next day, the victim called Emerson and told him that she was concerned about the defendant, that she thought he was in bad shape and doing drugs, and that he seemed mentally unstable.

On January 18, 2004, Arnold asked the defendant to leave the property because he had not performed any work on the farm for the prior two months. Arnold suspected that the defendant was drinking and doing drugs.

On January 26, 2004, around 8:30 P.M., while the victim was on the telephone, the defendant knocked on her door. The victim opened the door a few inches and saw the defendant. The defendant said that he wanted to come in and speak with her. She told him to go home and to telephone her in one-half hour, and she would speak to him on the telephone. She then closed the door and returned to her telephone conversation. Around 8:55 P.M., the victim finished her conversation and telephoned Emerson to inform him that the defendant had been to her house and that "he might be in bad shape." She also told Emerson that if he received a telephone call from her that evening, he should telephone the police and have them come to her house, no matter what she said.[2]

Shortly after speaking with Emerson, the victim heard a knock on her door. When she went to the door, the defendant was standing there and appeared distressed. She opened the door because the door had glass in it and she "thought it would be better to open the door than to try and keep him on the other side." The defendant came into the house and the victim told him to sit at the dining room table. She sat at the table with him and noticed that he was disturbed, and that he had blood on his left hand. She asked the defendant if he was suicidal, to which he replied that he was not. The defendant began to talk to the victim, mumbling to the point that she "had trouble understanding him." During this conversation, the victim got up, picked up the telephone, and told the defendant that she did not think he was all right, that she thought they should telephone Emerson, and that she thought he needed some help. The defendant then grabbed her around her back, shoved her, punched her face, and violently knocked the telephone out of her hand, throwing it on the floor where it broke. He then began to punch the victim, pull her hair, and maneuver her around. As he was beating the victim, he asked, "Why did you call Hank?"

At some point, the defendant pulled a knife out of his pocket. He said, "You can make this hard or you can make this easy." He then tried to force the victim to go upstairs. When they got to the bottom of the stairs, the victim sat "heavily" and resisted.

[2]After hanging up with the victim, Emerson telephoned the police, alerted them to the situation, and provided the victim's address, in case he telephoned back with an emergency.

After the defendant's attempts to push the victim up the stairs failed, he threw her on a couch located near the stairs in her living room and ripped off the clothing she wore on the bottom of her body.[3] He then pulled his pants down and lay on top of the victim. He put his finger into the victim's vagina and began thrusting.[4] The victim kept telling the defendant that "this . . . was not good," that it was "not going to happen," and that it was something she "didn't want to do." Nonetheless, the defendant continued raping her.

The defendant then sat up and told the victim to take her top off. She sat up and made a gesture as though she was going to comply. When the defendant began to pull his own shirt over his head, the victim ran toward the front door. She ran outside, naked from the waist down and not wearing shoes, towards Arnold's farmhouse. Arnold and Emerson let her into their house and the victim, who was hysterical and sobbing, told them that the defendant "had tried to rape" her. Emerson immediately called the police and they arrived at the house within ten minutes.

The police proceeded to the victim's residence and conducted a preliminary search. The police found a knife outside the victim's house.

The defendant testified in his own defense. He admitted to having had a long-term alcohol problem. When he moved into Arnold's apartment in 2000 he had been sober for eleven years; however, he did not remain sober. The defendant testified that he came to the victim's house on the day of the incident because he knew that the victim was a doctor and he thought she could help him in some way, such as getting him into a detoxification program. When he came to the victim's home, she invited him into the house. After some conversation, the victim told the defendant that she was going to telephone Emerson, and that Emerson would telephone the police. The defendant became afraid; he recently had been involved in two "DUI" (driving under the influence) cases and had been warned that if he was convicted of a third offense he would go to jail for six months.

---

[3]A chemist at the Massachusetts State police crime laboratory analyzed the victim's pants and located several tears on the exterior and the interior crotch area. The chemist testified that the pants were torn in a manner different from normal wear and tear such as when a person sits down and tears her pants.

[4]The defendant was unable to penetrate the victim with his penis.

The defendant testified that he then grabbed the victim and tried to persuade her not to telephone Emerson. Next, he kissed her, and he thought that she kissed him back. The defendant then offered to the victim to go upstairs but she refused. Next, they were on the couch; the defendant thought that the victim went to the couch willingly. He thought they were engaged in a consensual activity until the victim asked the defendant to stop.In response, the defendant stopped. He then sat up, the victim sat up, and, then, the victim ran out the door. The defendant denied putting his finger in the victim's vagina. Although the defendant had a knife, he did not threaten the victim with it. He tried to give the victim his knife because he was afraid that he was going to cut his wrists.

A few minutes after the victim ran out of her house, the defendant returned to his apartment, grabbed "a bunch of beers," and walked out into the woods. The next day, he found himself in Leominster, walking down the railroad tracks. His mother picked him up at the Leominster Public Library and brought him to Emerson Hospital, where he was arrested.

*Discussion. A. Convictions of home invasion and of armed assault in a dwelling.* The defendant claims that there was insufficient evidence of an unlawful entry to sustain convictions of home invasion and of armed assault in a dwelling. The crime of home invasion, G. L. c. 265, § 18C, requires that the defendant "(1) 'knowingly enter[ed] the dwelling place of another'; (2) 'knowing or having reason to know that one or more persons are present within' (or entered without such knowledge but then remained in the dwelling place after acquiring or having reason to acquire such knowledge); (3) 'while armed with a dangerous weapon'; and (4) 'use[d] force or threaten[ed] the imminent use of force upon any person within such dwelling place whether or not injury occur[red], or intentionally cause[d] any injury to any person within such dwelling place.' " *Commonwealth* v. *Doucette*, 430 Mass. 461, 465-466 (1999), quoting from G. L. c. 265, § 18C. See *Commonwealth* v. *Brown*, 451 Mass. 200, 205 (2008). See also *Commonwealth* v. *Stokes*, 440 Mass. 741, 746-747 (2004). "Conviction under G. L. c. 265, § 18A, of armed assault in a dwelling requires proof of three elements: (1) entry of a dwelling while armed[;] (2) an assault on someone in the dwelling; and

(3) a specific intent, accompanying the assault, to commit a felony." *Commonwealth* v. *Donoghue*, 23 Mass. App. Ct. 103, 111-112 (1986).

In short, entry is an element that must be proven by the Commonwealth for the offenses of both home invasion and armed assault in a dwelling. An entry into a dwelling is not unlawful if it is consensual, in response to an invitation, or privileged. See *Commonwealth* v. *Mahar*, 430 Mass. 643, 646-647 (2000). See also *Commonwealth* v. *Dunn*, 43 Mass. App. Ct. 58, 60 (1997); *Commonwealth* v. *Fleming*, 46 Mass. App. Ct. 394, 396 (1999). "A consensual entry, however, does not always correlate with a lawful entry. . . . [P]urported consent [to entry] cannot be considered legally significant unless the occupant has been made aware that the person at the door is armed with a dangerous weapon and is about to commit an assault once inside." *Mahar*, *supra* at 652-653. See *Commonwealth* v. *Morris*, 64 Mass. App. Ct. 51, 54 (2005). Thus, the *Mahar* court affirmed the defendant's home invasion conviction, concluding that the entry was unlawful where the defendant was admitted into the home by a person who was unaware that the defendant entered the home while armed, with the intent to commit an assault upon that person in the dwelling. *Mahar*, *supra* at 647, 651-653.

In this case, the jury's determination was based largely on a credibility evaluation of the testimony of the victim and of the defendant. While the crime of home invasion "is not intended to encompass situations where an invited guest in a home suddenly turns violent," *id.* at 652 n.6, this is not the evidence here. Here, the victim became disturbed and frightened by the defendant's visit earlier on the day of the incident; she telephoned her neighbor to warn him of the defendant's "bad shape" and instructed him to telephone the police if she telephoned him back. As in *Mahar*, while the victim initially permitted the defendant's entry, a jury permissibly could find that she did not know he was armed with a knife and that he intended to attack her once inside. Additionally, here, when the defendant arrived at the victim's house, she let him in her house because she "thought it would be better to open the door than to try and keep him on the other side." From all this evidence, the jury could infer that the defendant had instilled fear in the victim, who only allowed

him into her house because she felt that she had no other choice. Moreover, there was no evidence that the defendant was a frequent visitor at the victim's house, that he was accustomed to entering without explicit permission, or that the defendant and the victim were in any type of ongoing relationship. See generally *id.* at 647. Contrast *Commonwealth* v. *Fleming*, 46 Mass. App. Ct. at 396-397 (defendant entitled to jury instruction on consensual entry where defendant was frequent visitor at facility); *Commonwealth* v. *Simmarano*, 50 Mass. App. Ct. 312, 314-316 (2000) (defendant entitled to jury instruction on consent where there was evidence that defendant and victim had been in some form of ongoing relationship and that defendant was frequent visitor at victim's house). The evidence showed that, once inside the house, the defendant pulled out a knife, and ultimately dragged the victim to the couch and raped her. The totality of the evidence warranted the jury's determination that the defendant's entry into the victim's dwelling was unlawful.

B. *Jury instructions.* In defining home invasion, the judge first read to the jury the pertinent text of G. L. c. 265, § 18C, and then gave an almost verbatim recital of the model jury instruction on home invasion. See Massachusetts Superior Court Criminal Practice Jury Instructions § 2.31 (Mass. Continuing Legal Educ. 1999 & Supp. 2003). Because an issue in the case was whether the defendant lawfully entered the victim's home, in keeping with *Morris*, 64 Mass. App. Ct. at 54, the judge included in his instruction guidance regarding consensual entry. The judge instructed:

> "The first element which the Commonwealth must prove beyond a reasonable doubt is that the defendant entered the dwelling of another. An entry is the unlawful, unconsented making of one's way into a dwelling. . . . The Commonwealth must also prove beyond a reasonable doubt that the defendant had no right of habitation or occupancy at the time of entry, that the defendant made a nonconsensual entry into the dwelling place. While consent to enter may be considered as evidence that the entry was lawful, consent may be negated if the person giving consent is unaware of the defendant's being armed with a dangerous weapon or of an intent to commit a crime while inside."

The defendant asserts that the judge erred and that the error created a substantial risk of a miscarriage of justice when he instructed that consent to enter a dwelling "may be negated if the person giving consent is unaware of the defendant's being armed with a dangerous weapon *or* of an intent to commit a crime while inside" (emphasis supplied).[5] He points to the court's holding in *Mahar*, 430 Mass. at 652-653, that "consent [to entry] cannot be considered legally significant unless the occupant has been made aware that the person at the door is armed with a dangerous weapon and is about to commit an assault once inside." The defendant claims that the jury should have been instructed that consent may be negated if the person giving consent is unaware that the defendant is armed *and* intends to commit a crime once inside the dwelling.

The defendant's argument is unpersuasive because the judge's instruction is indeed consistent with *Mahar*, which requires both elements for consent to be valid. The instruction, conversely, properly informs the jury, that the absence of either element will *negate* consent. *Mahar* does not require that the Commonwealth prove that the occupant has been made aware *both* that defendant was armed with a dangerous weapon and that he intended to commit an assault once inside the dwelling. That is to say, if the Commonwealth shows that either element was not present, then there was no consent. Consistent with a commonsense understanding, the law protects the sanctity and the safety of the occupant within her dwelling, and reflects the view that the entry by an outsider can be considered permissive only if the occupant, with relevant information, is aware of the risks to her safety, yet freely allows the entry. Thus, permissive entry, premised on consent to enter, is negated if the occupant purportedly giving consent is not aware that the person who is entering is armed. Alternatively, if the occupant is aware that the person is armed, but unaware that he intends to commit a crime once inside, permissive entry also is negated. "[A]s a matter of public policy, . . . an occupant of a dwelling cannot consent to allow an armed intruder . . . inside to

---

[5]Because the defense counsel did not object to the jury instructions at trial, we examine the alleged error, if any, for whether it created a substantial risk of miscarriage of justice. See *Commonwealth* v. *Noble*, 429 Mass. 44, 45-47 (1999).

commit an assault." *Id.* at 653. See *Morris*, 64 Mass. App. Ct. at 54 n.4. There was no error here.[6]

C. *Duplicative convictions*. Finally, the defendant asserts that while armed assault in a dwelling is not a lesser included offense of home invasion, because the defendant was convicted of both offenses on the basis of the same act, and the two crimes are so closely related, the defendant should not be subject to punishment for both.

The traditional rule, embodied in *Morey* v. *Commonwealth*, 108 Mass. 433, 434 (1871), and employed by Massachusetts courts on the issues of double jeopardy and duplicative offenses, provides that "a defendant may properly be punished for two crimes arising out of the same course of conduct provided that each crime requires proof of an element that the other does not." *Commonwealth* v. *Keohane*, 444 Mass. 563, 574 (2005), quoting from *Commonwealth* v. *Arriaga*, 44 Mass. App. Ct. 382, 385-386 (1998).[7] The vitality of that elements-based rule was affirmed in *Commonwealth* v. *Vick*, 454 Mass. 418 (2009). There, the Supreme Judicial Court stated, "This elements-based approach remains the standard for determining whether multiple convictions stemming from one criminal transaction are duplicative. See *Commonwealth* v. *Cabrera*, 449 Mass. 825, 827 (2007); *Commonwealth* v. *Gallant*, 65 Mass. App. Ct. 409, 413 (2006); . . . *Arriaga*, *supra* at 386-389." *Vick*, *supra* at 431. "It bears repeating that, where . . . neither crime is a lesser included offense of the other, multiple punishments are permitted

---

[6]Even if the instruction were erroneous, as discussed, *supra*, there was ample evidence to warrant the jury's conclusion that the entry was not consented to, and therefore was unlawful. Hence, even if error, the error did not create a substantial risk of a miscarriage of justice.

Regarding entry as relating to armed assault in a dwelling, the judge instructed: "The second element which the Commonwealth must prove beyond a reasonable doubt is that the defendant entered the dwelling. It is not necessary, as I said before, that the entry be complete. It would be sufficient if any part of the defendant's body physically enters the building." The instruction was not error.

[7]"So long as each offense includes an additional element that the other does not, 'neither crime is a lesser-included offense of the other, and convictions on both are deemed to have been authorized by the Legislature and hence not duplic[ative].' " *Arriaga*, *supra* at 386, quoting from *Commonwealth* v. *Jones*, 382 Mass. 387, 393 (1981).

even where the offenses arise from the very same criminal event. See *Morey* v. *Commonwealth,* [*supra*]." *Vick, supra* at 436.[8]

Here, the two crimes in question have mutually exclusive elements; specifically, the requirement of scienter distinguishes these two offenses. *Commonwealth* v. *Ruiz,* 426 Mass. 391, 393 & n.3 (1998).[9] As such, and under the *Morey* rule, the defendant can be prosecuted for, and convicted of, both offenses simultaneously, even though they arise from the single course of conduct. The convictions of armed assault in a dwelling and of home invasion are not duplicative, and, therefore, the defendant properly is subject to punishment for both offenses.

*Judgments affirmed.*

---

[8]Discussing cases relied on by the defendant here, including *Commonwealth* v. *Keohane, supra* at 574-575, the *Vick* court noted, *supra* at 433-434, that "it may appear that our well-established, elements-based approach to analyzing purported duplicative convictions, as first articulated in *Morey,* has been expanded over the years to permit a conduct-based analysis of the facts of a particular case to determine whether a defendant's acts in one criminal event are so closely related as to constitute in substance a single crime such that the defendant can be punished only for the greater offense. . . . That was not our intention."

[9]"Both §§ 18A and 18C require the Commonwealth to prove that the defendant was armed with a dangerous weapon at the time of entry into a dwelling house. If the Commonwealth seeks, however, to impose the more severe penalties of § 18C it must establish either that a defendant knew or had reason to know that one or more persons were present within the dwelling house at the time of entry or that the defendant gained such knowledge after entry but nevertheless remained there for some period of time prior to attacking or threatening the person. These scienter requirements distinguish § 18C from § 18A." *Commonwealth* v. *Ruiz, supra* (footnote omitted).