COMMONWEALTH *vs.* JOHN D. CAMPBELL. No. 93-P-588. December 7, 1994. *Evidence*, Hearsay, Impeachment of credibility, Prior inconsistent statement. *Witness*, Credibility.

The defendant's appeal — from guilty verdicts on three counts of assault with intent to kill, G. L. c. 265, § 29, and two counts of assault with a dangerous weapon, G. L. c. 265, § 15B(*b*) — understandably focuses on the judge's ruling admitting in evidence testimony regarding an alleged prior inconsistent statement of the defendant's alibi witness. We review the proceedings at the trial.

1. *The shooting and the identification testimony.* The Commonwealth's case was essentially this. On the night of June 17, 1991, Victor Pabon, Juan Vasquez, Carlos Toro and Pedro Gonzales, all of whom lived in the Carlson Road area in Framingham, were in search of a party. Unsuccessful, they started walking home. While en route, a man and a woman passed by on a black mountain bicycle. The woman was riding on the handlebars. As they passed, the woman asked the group, "What are you looking at?" In response, Pabon approached the couple and asked the man if there was any problem. The bicyclist said there was no problem, and the four men continued on their way home. Pabon testified that when he first saw the man and woman on the bicycle, "I couldn't see that well, but they were approaching, there was a guy and there was a girl on the bike." He further testified that it "wasn't too light, it was dark." As the bicycle approached to within five to seven feet of him, Pabon said he was able to see the person on the bicycle, and he saw that the rider was black. When Pabon went up to the man and had the short discussion with him, he was unable to see him any better because "he was too dark." He did notice the man was wearing a "black like a sweat suit and a hat that said Raiders on it" and the bicycle was a "[m]ountain, ten speed . . . [a] ten speed, black bike." When pressed for additional details, Pabon was unable to describe the rider any further.

Pabon was recalled the following morning. Now Pabon bolstered his earlier testimony and testified that the defendant was wearing a nose earring and that when the rider talked Pabon saw "golden teeth."

Toro described the bicyclist as wearing "black jeans, black sweater with a hood on, and a Raider hat, black" and having "an earring in his nose." Toro did not testify to a gold tooth. Vasquez testified that he noticed the man on the bicycle was wearing "a sweatshirt with a hood and a hat . . . a Raiders [hat]." But, he was unable to determine the color of the man's skin because "It was too dark. There's no light over there."

Later, when the group arrived at Carlson Road, Gonzales left the group and returned to his own residence. The other men, now joined by Eduardo Garcia, remained outside Pabon's apartment talking. Pabon, Toro and Garcia were standing on the sidewalk facing the parking lot; Vasquez was facing away from the parking lot.

After about fifteen minutes, a man, who was dressed in black, rode a black mountain bicycle through the parking lot and looked at the group who were talking. Pabon and Vasquez recognized the rider as the same bicyclist encountered earlier in the evening.[1] Pabon said that he "saw the guy on the bike, the same clothes." The rider "was wearing a black sweatsuit, a Raiders hat . . . the same bike, mountain, ten-speed, black." As the man approached the group, Pabon saw "gold teeth and the earring on his nose."

Toro testified that he was facing "towards" the bicyclist when he approached the group and saw "the earring" in his nose, "[t]he black hat and the hood and the black jeans" and the "black . . . mountain bike." Vasquez said the rider was wearing "the same clothes we saw on the guy in Natick, a black shirt, the hat, [the] Raiders hat, and the same bike . . . [but] I couldn't see his face."

The bicyclist went past the group to the end of the street, turned around and returned. He stopped in front of the group, shouted profanities, brought out a handgun and fired four shots in the direction of the group who, needless to say, hit the ground. Pabon took what seemed to be a glancing shot from a ricocheted bullet. The shooter fled the scene.

Shortly after the incident, Pabon,[2] Toro[3] and Garcia,[4] separately, identified the defendant as the shooter from an array of nine photographs. The arresting officer testified that the defendant had an earring in his nose and a gold tooth at the time of his arrest. The following day, the officer, notic-

---

[1]Vasquez testified that he was unable to see the face of either the man or woman on the bike, or even determine the color of the man's skin, when the rider and the woman were first encountered while the group was walking home.

[2]Pabon said he looked at the photograph "for at least five minutes" and "told [the officer] that I wasn't a hundred percent sure because there was something missing . . . [i]t was the guy, but there was something missing in [his] face." Pabon spoke to the officer the following day and told him "The reason I wasn't a hundred percent sure, [was because] there was something missing . . . . [H]is mouth wasn't open . . . . I didn't see the golden teeth there."

ing that the gold tooth was missing, asked the defendant (after giving Miranda warnings) what happened to it. According to the officer, the defendant replied that it was a "cap and that he had given it to his girl friend, Tina."

Pabon, Toro and Garcia made in court identifications of the defendant as the shooter. Pabon and Garcia testified that they had met the defendant on prior occasions. Garcia said that on those prior occasions he had noticed that the defendant "had two gold teeth" and an "earring in his nose." Vasquez and Gonzales were unable to identify the shooter; they couldn't see his face.

2. *The error regarding the alleged prior inconsistent statement.* The defendant's wife (Tina) provided the alibi defense. She testified that she was with her husband the entire night of July 19, 1991, in Roslindale, visiting the defendant's family and spending the night at his mother's house. On cross-examination the following exchange occurred: Q. "Didn't you go to Carlson Road last Friday?" A. "No." Q. "Didn't you speak to Victor Pabon and tell him that he shouldn't come into court because people were going to get angry?" A. "No." Q. "Didn't you tell him that if he came to court that he should I.D. Campbell wrong?" A. "No." Q. "Didn't you tell him John Campbell told you he was sorry for what he did?" A. "No." Thereupon the defendant's counsel objected, and the judge ruled, "That may be stricken."

Victor Pabon testified in rebuttal that Tina had come to his residence on Carlson Road and had identified herself as the defendant's wife.[5] The following exchange then occurred.

Q. "What did she tell you at that time, sir?" Defendant's counsel objected, and the judge ruled that "[t]his is being admitted solely for the purpose of whether or not it contradicts another witness. This is not being offered on the case in chief."

Q. "What did she tell you, sir, after she identified herself?"

A. "She told me she came to tell me that John Campbell called her, and she told me that he was sorry." Counsel objected, and the judge ruled that "[t]his may stand on whether or not it contradicts a prior witness." Then Pabon added to his answer, "[She told me] [h]e was sorry for what he did, and for me not to show up in court. If I do show up in court and he gets sent to jail, a lot of people are going to be angry."

The defendant claims that both parts of Pabon's testimony — (i) that Tina had come to Carlson Road and threatened him, and (ii) that Tina said that Campbell said he was sorry for what he did — should have been

---

[3]Toro testified that when he saw the array of photographs he picked out the defendant's and told the officer "that that was the guy . . . that he had the same earring."

[4]Garcia said that after he looked at the array of photographs, "I picked out the one [of the defendant], and I gave it to [the officer]."

[5]Tina and the defendant were married after the arraignment and before the trial.

excluded, not merely limited to impeachment by contradiction. We disagree with the defendant as to the first part of Pabon's testimony and agree as to the second part.

The correctness of the limited admission of the first part of Pabon's testimony is based upon the following facts: Tina was a material witness; it was she who offered the testimony supporting the defendant's alibi. Her credibility, therefore, was vital to the defense. Evidence that she lied about threatening the Commonwealth's principal witness was a matter which the trial judge correctly found to be material and thus admissible because it "bears upon a central issue in the case . . . [and] the judge has no discretion to exclude extrinsic evidence of it." Liacos, Massachusetts Evidence § 6.6.2(a) (6th ed. 1994). See *Commonwealth* v. *Turner*, 224 Mass. 229, 237 (1916) (witness' denial of the identity of the defendant as the wrongdoer contradicted by inconsistent statements). See also *Commonwealth* v. *Hesketh*, 386 Mass. 153, 161 (1982), quoting from *Commonwealth* v. *A Juvenile*, 361 Mass. 214, 218 (1972) (trial judge's discretion to exclude proffered testimony contradicting the testimony of a witness has no application where the contradictory statments "*relate to* the main issue that is being tried" [emphasis added]).

The admission of the second part of Pabon's testimony — even for limited purposes — included the hearsay statement of Tina, and, therefore, that part should have been excluded. See *Commonwealth* v. *McDonough*, 400 Mass. 639, 643 n.8 (1987) (multiple hearsay statements are admissible only if each statement in the chain of statements falls within an exception to the hearsay rule). Furthermore, the statement lacked the necessary foundation. The judge *struck* Tina's denial of the prosecutor's question regarding her statement to Pabon that the defendant told Tina that he was sorry for what he did. The result is that "there was no prior testimony by . . . [Tina] to which the offered impeachment [by Pabon] directly related." *Commonwealth* v. *McGowan*, 400 Mass. 385, 391 (1987). Thus the second part of Pabon's rebuttal testimony, allegedly contradicting Tina's prior testimony, should have been excluded, and we must consider the consequences of that error.

The defendant's counsel objected to the prosecutor's question regarding the conversation at the meeting between Tina and Pabon. The judge ruled on the limited admissibility, and the question was then repeated by the prosecutor. Counsel did not repeat his objection, but the Commonwealth makes nothing of that fact, nor do we. We judge the question on the standard of whether the error was prejudicial. This means we must decide whether "the error possibly weakened [the defendant's] case in some significant way so as to require a new trial." *Commonwealth* v. *Daggett*, 416 Mass. 347, 352 n.5 (1993), quoting from *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983). See also *Commonwealth* v. *Reed*, 397 Mass. 440, 443 n.4 (1986), where Justice Abrams quotes extensively from *Kotteakos* v. *United States*, 328 U.S. 750, 763-765 (1946), from which the following

is taken: "The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting. . . . [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." See also *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

We conclude that the substantial rights of the defendant were adversely affected. The prosecution's case on the issue of identification was hardly overwhelming. In that context, the statement, "He [the defendant] was sorry for what he did, . . ." coming as it did at the very end of the trial and understood by the jury to be admitted for all substantive purposes — there were no limiting instructions — was equivalent to an admission of the defendant's culpability on the central issue of the case, whether the defendant was the shooter. Thus, the error "possibly weakened the [defendant's] case in some significant way so as to require a new trial." *Daggett, supra.*

The defendant's remaining arguments either have no merit or are not likely to arise at a new trial. No further discussion is required.

The judgment is reversed and the conviction set aside.

*So ordered.*

*Julie Ann Boyden* for the defendant.
*James D. Takacs,* Assistant District Attorney, for the Commonwealth.