COMMONWEALTH vs. PAUL JOHNSON.

No. 99-P-1248.

Essex. March 14, 2001. - March 19, 2002.

Present: PERRETTA, LAURENCE, & MASON, JJ.

*Evidence,* Hearsay, Spontaneous utterance, Impeachment of credibility, Rebuttal. *Jury and Jurors. Practice, Criminal,* Challenge to jurors, Voir dire, Fair trial, Continuance, Assistance of counsel. *Constitutional Law,* Assistance of counsel.

In a criminal case in which the victim's refusal to testify was constitutionally protected, the judge did not abuse his discretion in finding and concluding that the victim's statements to a nurse and police officers were admissible pursuant to the excited utterance exception to the rule against hearsay evidence. [226-230]

In a criminal case in which the defendant was an African-American male and the victim a Caucasian female, the judge did not abuse his discretion in refusing the defendant's specific request to question prospective jurors about their attitudes concerning interracial dating, where the judge conducted an individual voir dire of the prospective jurors that sufficiently focused the jurors' attention on possible racial prejudice toward a black person. [230-231]

At a criminal trial, the judge did not abuse his discretion in allowing the Commonwealth to present evidence to refute the suggestion that the victim was not under the defendant's influence at the time she made statements to the defendant's investigator recanting previous allegations she made against the defendant. [233]

There was no merit to a criminal defendant's arguments that the proceedings against him, viewed as a whole, lacked the appearance of fairness because he was denied representation by counsel of his choice [234], or because he was denied access to a witness in his favor [234-235].

This court declined to consider a criminal defendant's contention that he did not receive effective assistance of counsel, where the defendant's argument consisted of no more than conclusory statements. [235]

INDICTMENTS found and returned in the Superior Court Department on September 17, 1997.

The cases were tried before *Robert A. Barton,* J.

*Evan M. Fray-Witzer* for the defendant.

*Catherine Langevin Semel,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On August 16, 1997, at about 2 A.M., the victim appeared at a hospital emergency room. She was accompanied by a man, never identified, who told a nurse that he had found the victim on the side of a road. The victim, in turn, told medical personnel and the police how the defendant, with whom she resided, had beaten and terrorized her throughout the night. It appears from various pretrial hearings that, rather than testify against the defendant, the victim invoked her right against self-incrimination. The judge allowed the victim's claim of privilege, and the Commonwealth proceeded to trial on the basis of the victim's statements to medical personnel and police officers. On appeal from his convictions on indictments charging him with assault and battery by means of a dangerous weapon (a gas grill lighter) and assault and battery, the defendant challenges the judge's determination that the victim's statements were excited utterances and admissible hearsay, his refusal to question prospective jurors about their attitudes concerning interracial dating,[1] and his various rulings throughout the trial. He also claims that the proceedings against him lacked the appearance of fairness and that he did not receive effective representation. Concluding that the judge's rulings were well within the range of his discretion and that trial counsel provided the defendant with more than competent representation, we affirm the judgments.[2]

1. *Pretrial hearings and rulings.* There were several pretrial hearings that are relevant to the issues raised on appeal. The first concerns the victim's refusal to testify. Because the victim's testimony could implicate her in numerous crimes (use, possession, and sale of drugs, possession and use of alcohol by a minor,[3] extortion, and prostitution), the judge concluded that the victim's refusal to testify was constitutionally protected. The defendant does not challenge this ruling.

Given that the victim would not be required to testify, another hearing was held to determine whether the victim's statements

---

[1]The defendant is African-American, the victim Caucasian.

[2]The judge allowed the defendant's motion for required findings of not guilty on indictments charging him with kidnaping and mayhem.

[3]In 1997, the victim was nineteen years of age.

to various medical and law enforcement persons would be admissible under the "excited utterance" exception to the rule against hearsay evidence. After an evidentiary hearing, the judge ruled that the victim's statements to an emergency room nurse and an investigating police officer were admissible. The defendant challenges this ruling.

Also prior to trial, the defendant requested that the judge question prospective jurors about their attitudes concerning interracial dating. Although the judge individually questioned prospective jurors about racial attitudes, he made no specific inquiry about their views concerning interracial dating. The defendant claims that this ruling was erroneous.

Five days prior to trial, an attorney sought leave to file his appearance on the defendant's behalf as well as a continuance so that he could prepare to represent the defendant. This attorney declined to file his appearance when the judge denied the request for a continuance. This ruling, so claims the defendant, also requires reversal of his convictions.

a. *Admissibility of the victim's hearsay statements.* Because the victim would not testify at trial and because the Commonwealth could not meet its burden of proof unless her hearsay statements against the defendant were admitted in evidence for their substantive value, we consider first the question whether the victim's statements were admissible under the excited utterance (spontaneous exclamation) exception to the rule against hearsay evidence. The evidentiary foundation necessary for the admission of such utterances or exclamations was recently capsulized in *Commonwealth* v. *Santiago*, 52 Mass. App. Ct. 667, 671-672 (2001):

> "Under that exception . . . , ' "a statement is admissible if its utterance was spontaneous to a degree which reasonably negated premeditation or possible fabrication and if it tended to qualify, characterize and explain the underlying event." . . . Such statements are admissible because they are made in circumstances rendering them "particularly trustworthy." . . . "[T]he statements need not be strictly contemporaneous with the exciting cause." ' *Commonwealth* v. *Marshall*, 434 Mass. 358, 363 (2001) (citations omitted). A statement may be deemed spontaneous,

even if not made at a time strictly contemporaneous with the exciting cause, if 'made under the influence of an exciting event and before the declarant has had time to contrive or fabricate the remark, and thus it has sufficient indicia of reliability.' *Commonwealth* v. *Nunes*, 430 Mass. 1, 4 (1999), quoting from *Commonwealth* v. *Zagranski*, 408 Mass. 278, 285 (1990)."

See *Commonwealth* v. *Tevlin*, 433 Mass. 305, 318 (2001); *Commonwealth* v. *McLaughlin*, 433 Mass. 558, 565 (2001).

According to what the victim told the witnesses, she returned home to her apartment in Lynn, which she shared with the defendant, later than expected, and they argued. Over the next several hours, the defendant punched the victim, knocked her down, and kicked her. At one point he wrapped her in a blanket and turned on a radio to cover her screams. He tied her hands and feet, put her in the bathtub, and tried to drown her. He urinated and defecated on her and burned her breasts with a gas grill lighter.

Thereafter, the defendant allowed the victim to clean herself, and he then ordered her to telephone a man who owed her money for her sexual services. The victim obeyed, telephoned the man, and told him that she wanted to see him. Sometime after midnight, the defendant drove the victim toward the Newton residence of the alleged customer. Throughout the trip, the defendant continued to beat and threaten the victim. He put a tape recorder in her purse and instructed her to record her conversation with the alleged customer. He gave her a warning, delivered in obscene terms, not to fail in the mission. Although the so-called customer did not testify at the evidentiary hearing, the parties stipulated to the fact that he heard his doorbell ring at about 1 A.M , looked outside, and saw a vehicle that matched the description of a vehicle owned by the defendant.[4]

When the defendant and the victim arrived at the customer's residence, at about 1 A.M., the victim alighted from the defendant's vehicle and, at some point thereafter, fled. She was able to flag down a passing motorist who first brought her to his

---

[4]Although the alleged customer was not present at the pretrial hearing, he testified at trial.

residence and then to the hospital.[5] The victim entered the emergency room at 2:05 A.M.

During her examination at the hospital, the victim complained of pain throughout her body, especially around her jaw, eyes, and one hip. There were multiple contusions all over her body as well as first and second-degree burns on her breasts. She had obvious bruises upon her admission, and more appeared during her stay at the hospital. The victim's blood pressure was slightly elevated, a condition often associated with pain. As for her medical history, the victim informed the nurse that she had asthma and was being treated, with medication, for depression.

Throughout the examination of the victim, the nurse found her able to respond to questions appropriately. However, the nurse also testified that the victim was "very scared and nervous," "weak and shaky," "[a]ny noise, she was jumpy." The nurse also stated that the victim appeared frightened that the defendant would come to the emergency room and find her, that she seemed "distant" and somewhat "disoriented," scared but not "hysterical."[6]

One of the officers who responded to the nurse's summons testified that, at about 2:40 A.M., he saw the victim in the hospital's examination room. He related that she had bruises about her face, eyes, and lips, and that during his conversation with her, she rambled. Her attitude or mood varied from fairly calm to "quite excited and crying." She appeared fearful and "would jump at noises, at people walking by and coming in and out of the hospital." The victim gave this officer a tape recorder that she had turned on during the drive to the alleged customer's house. The officer testified that he reviewed the tape, that he heard female and male voices, and that the male voice threatened the female. At the victim's request, the officer contacted the victim's mother.

Upon her arrival at the hospital at about 4 A.M., the victim's

[5]By the time the treating nurse was able to leave the victim and seek out the man who had brought her to the emergency room, he had departed from the hospital. This man's identity was never discovered.

[6]The nurse also identified photographs that depicted swelling about the victim's jaw, a cut inside her lip, swelling and contusions on her right torso, chest, thigh, and buttock, left upper thigh and hip, left forearm, and right upper arm, forearm and wrist, as well as burns to both breasts.

mother found her daughter in a hospital bed, curled in the "fetal position," shaking and whimpering. She observed bruises on the victim and believed her to be in pain.

Ninety minutes later, about 5:22 A.M., another officer arrived at the hospital. He found the victim sitting in a wheelchair outside the emergency room. There was a police officer with her, and she was smoking a cigarette. According to the witness, she was "very, very upset," her voice was "crackled," she was shaking, had "tears in her eyes," and spoke with difficulty.

Based upon the evidence presented at the hearing, the judge found and concluded that the victim's statements to the nurse and officers were admissible pursuant to the "excited utterance" exception to the rule against hearsay evidence. On this issue, the sole question before us is whether the judge abused his discretion in finding and concluding that the statements were "spontaneous to a degree which reasonably negated premeditation or possible fabrication," *Commonwealth* v. *Santiago*, 52 Mass. App. Ct. at 671, and were, therefore, admissible in evidence.

Relying upon his view of the evidence, the defendant cites snippets of the testimony given at the evidentiary hearing and argues about the time span between the exciting event (which he limits to the beginning of the victim's beating in Lynn at about 7 P.M.) and the victim's statements at the hospital in Needham at about 2:05 A.M, as well as the facts that the victim's statements were made in Needham rather than Lynn and that the various statements testified to by medical personnel showed that the victim had moments of calm throughout her bouts of crying and fear.[7] This argument is no more than a quarrel with the judge's assessment of all the evidence presented at the hearing. Upon review, we conclude that there was ample

---

[7]As additional support for his claim that the victim's statements were inadmissible, the defendant relies upon matters not before the judge at the time of his ruling on the pretrial motion. He cites to a letter written by the victim and to some of her medical records. However, those documents were neither before the judge at the pretrial hearing nor, in fact, ever admitted into evidence. Further, some of the facts relied upon by the defendant that were presented at trial went only to the victim's credibility. See, e.g., *Commonwealth* v. *Mahar*, 430 Mass. 643, 649-650 (2000).

evidence to support the judge's ultimate finding and conclusion. See *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 224 (1973).

b. *Jury empanelment.* By pretrial motion, the defendant asked the judge to put seventeen questions to the prospective jurors on individual voir dire. His claim on appeal is limited to the judge's refusal to put to each juror the following questions: "Do you have any opinions or feelings about domestic or romantic relationships between African-American males and Caucasian females? Would your opinions or feelings affect your ability to decide this case based solely on the evidence you heard in court?"

In taking up the defendant's claim, we begin by noting that the judge first informed the pool of prospective jurors of the fact that the case before them involved an African-American male accused of assaulting his Caucasian girlfriend at their mutual residence. After this description of the case and general questions put to them collectively, the judge then inquired of each of them, on individual voir dire, whether he or she understood that the presumption of innocence applied to an African-American as well as to a Caucasian; believed that an African-American was "more likely guilty because of his color"; was able to decide the case fairly and impartially, "putting out of your mind the race of the defendant"; would find that the "testimony of a black person is less believable than that of any other race"; and was aware of any bias or prejudice "in relation to any of the parties in this case" or any other reason why he or she could not stand "indifferent." The defendant makes no complaint that any juror responded to these questions in a manner that required additional questioning.

Because the judge did conduct an individual voir dire of the members of the jury pool as to possible racial bias (compare *Commonwealth* v. *Grice*, 410 Mass. 586, 590-591 [1991]; *Commonwealth* v. *LaFaille*, 430 Mass. 44, 49-53 [1999], where the judges refused to conduct individual voir dires on the subject), the only question before us is whether the judge abused his discretion in refusing to put to each juror the specific question posed by the defendant on the matter of interracial dating. We think this case is controlled by *Commonwealth* v. *Pope*, 392 Mass. 493, 505 (1984). There, the judge conducted an individual

voir dire of the prospective jurors on the matter of racial prejudice and put to them questions substantially similar to those put to the jurors in the instant case. The court concluded that the "questions asked by the judge were sufficiently clear and specific to focus a juror's attention on possible racial prejudice toward a black person, and therefore the denial of the defendant's requested questions was within the judge's sound discretion." *Ibid.* See *Commonwealth* v. *Martin*, 50 Mass. App. Ct. 877, 880 (2001). On the record before us, we reach the same conclusion, that is, the judge's ruling was well within the range of his discretion.

2. *Trial.* At trial the Commonwealth presented the previously recited evidence of the victim's excited utterances as well as evidence of the following facts. At about 4 A.M., while the victim was still at the hospital, the police went to the defendant's residence. No one responded to their presence, and they were unable to locate the vehicle that had been described to them. They returned at 6:45 A.M., and saw that although there was ample parking available immediately in front of the defendant's residence, the vehicle to which they had been alerted was parked on a side street. After some effort, the police were able to locate the defendant within the building and place him under arrest. A search warrant for his residence was obtained. Upon execution of the warrant, the police observed a substance, which appeared to be human excrement, on the door to the bathroom, in the bathtub, and on a bathrobe. The bathrobe was twisted and was tied with lengths of cord similar to that used in telephones and vacuum cleaners. The officers saw that the furniture in the living room was overturned and that there was a large hole in the wall from which a long straight strand of brown hair protruded. The officers also found a gas grill lighter on top of a bedroom bureau.

. Additionally, the Commonwealth presented the customer, who testified about his observation of a vehicle similar to that of the defendant's which was parked outside his home at about 1 A.M. on the date in question. See note 4, *supra.* There was also a tape recording of threatening statements made by the

defendant to the victim during their drive to the customer's house.[8]

After the Commonwealth rested its case, the defendant called three witnesses to testify on his behalf. Two of the witnesses, his former wife and a friend, provided him with an alibi. The former wife related that the defendant was with her at her home from about 7 P.M. to about 10 P.M. on August 15. His friend testified that sometime in August, 1997, the defendant telephoned him and complained that his girlfriend had taken his truck. Later that night, at about 10 P.M., he drove to the home of the defendant's former wife, picked up the defendant, and drove him to his apartment. There the witness and the defendant remained, watching television, until shortly after midnight. At that time, the witness gave the defendant a ride to the home of another friend, one Juay Reid.[9] It was shortly after midnight when the witness left the defendant outside Reid's residence.[10]

The third witness to testify on the defendant's behalf was his investigator. This witness was called by the defendant for the sole purpose of impeaching the victim's hearsay testimony. See *Commonwealth* v. *Mahar*, 430 Mass. 643, 649-650 (2000). According to the investigator, she and defense counsel met with the victim on the night of the first day of trial. At this time the victim informed the investigator that her pimp, whom she knew only as "John," had been her assailant and driver to the customer's house. The victim told the investigator that she had named the defendant as her assailant because he had been neglecting her and because she did not want her mother to learn that she, the victim, was a prostitute. As related by the investigator, the victim also stated that the motorist who had driven her to the emergency room first brought her to his residence and gave her a nonalcoholic beverage. The investigator testified that the victim told her that after she drank this beverage, she

---

[8]The victim's sister identified the voices on the tape as being those of her sister and the defendant.

[9]Reid did not testify.

[10]This witness was unable to recall the exact date in August upon which these events occurred. He also testified that although he did not know the date of the defendant's arrest, he knew that the defendant called him about two days thereafter, advising that he was in jail and in need of money (presumably for bail).

smoked a number of cigarettes and gave her motorist-rescuer oral sex in exchange for money.

a. *Rebuttal evidence.* To refute the thrust of the investigator's testimony, that the victim's recantation of her allegations was not made under pressure from the defendant, the Commonwealth was allowed to call a rebuttal witness. This witness, a victim-witness advocate who had been assigned to the case and was attending the trial, testified that when she arrived at the courthouse that very morning, she saw the victim and the defendant engaged in conversation. She also stated that the victim did not appear to be upset or fearful while speaking with the defendant.

Asserting that rebuttal evidence is permissible only for purposes of refuting substantive evidence, the defendant claims the judge erred in allowing the victim-witness advocate to testify.[11] We can think of no reason why we should conclude that the judge abused his broad range of discretion in allowing the Commonwealth to present evidence to refute the suggestion that the victim was not under the defendant's influence at the time of her statements to the defendant's investigator. See *Commonwealth* v. *Guidry*, 22 Mass. App. Ct. 907, 909 (1986) ("[r]ebuttal is legitimate when it responds to the opponent's case; in this circumstance, at any rate, the judge, as the controller of the trial, has a nearly unreversible discretion to allow it"); *Commonwealth* v. *Johnson*, 41 Mass. App. Ct. 81, 89 (1996) (quoting from *Guidry, supra,* and concluding rebuttal in issue was "responsive" and "legitimate").

b. *Appearance of fairness.* We can make short shrift of the defendant's argument that the proceedings against him, viewed as a whole, lacked the appearance of fairness. See *Commonwealth* v. *Howard,* 367 Mass. 569, 571-572 (1975). He claims that he was denied representation by counsel of his

---

[11]As support for this broad proposition, the defendant cites the narrow and inapposite holdings in *Drake* v. *Goodman,* 386 Mass. 88, 92 (1982), and *Commonwealth* v. *Campbell,* 37 Mass. App. Ct. 960, 963 (1994). As we read *Drake, supra,* it stands for the proposition that a party has a right to present rebuttal evidence that supports his affirmative case; in the absence of a right to present such evidence, the matter rests within the sound discretion of the trial judge. In *Campbell, supra,* we concluded that rebuttal evidence was erroneously admitted because there was nothing to rebut: the testimony to which it related had been struck by the trial judge.

choice and access to a witness in his favor. No matter how couched, the defendant's argument is no more than a quarrel with the judge's refusal to grant a continuance so that new counsel could come up to speed and be prepared to go forward on the scheduled trial date and an attribution of blame directed at the Commonwealth because of a witness's failure to appear.

1. *New counsel.* Five days prior to the scheduled trial date, an attorney brought a motion requesting that he be allowed to file his appearance on behalf of the defendant. His request was based upon the condition that a continuance be granted. At the hearing on the motion, it became apparent that new counsel would need "much more time" to prepare than was currently scheduled. Further, the judge made inquiry of defense counsel of record about the defendant's concerns in respect to his investigation and preparation of the case. Contrary to the defendant's contention, the judge did not deny the defendant his right to counsel of his choice. Rather, the judge ruled that substitute counsel could file his appearance so long as he appeared ready to proceed on the scheduled trial date. The ruling was well within the broad range of the judge's discretion. See *Commonwealth* v. *Chavis,* 415 Mass. 703, 711-712 (1993).

2. *Interference with a witness.* It is alleged that Juay Reid, an anticipated alibi witness, did not appear to testify on behalf of the defendant (see note 9, *supra*). It appears that he was arrested at some point prior to the third day of the defendant's trial. The Commonwealth accepts responsibility for the actions of the arresting officers.

On appeal, we can look only to the record. The record shows the prosecutor knew nothing about Reid's arrest until the judge informed her of the matter[12]; after a District Court hearing, which occurred on the third day of the defendant's trial, Reid was released and told to report to give his testimony in the instant case; defense counsel reported that Reid had transportation to the courthouse and that he had made assurances about his appearance; and the prosecutor and the judge did all that

---

[12]As best we can glean from the record, the police learned from a background check that there were outstanding warrants for the arrest of the witness and that, acting on their own and without direction from the prosecutor, they executed those warrants.

they could to accommodate the defense in securing Reid's testimony.

There is nothing on the record before us that establishes that Reid was in fact unavailable to testify because of his arrest on warrants outstanding against him or whether he was available but not called upon to do so for reasons of defense strategy. In short, the only fact established by the record that supports the defendant's claim is that Reid did not testify on his behalf. That is a much too insufficient basis to support a conclusion that the defendant's trial so lacked the appearance of fairness as to require a new trial.

3. *Ineffective assistance of counsel.* This argument consists of no more than conclusory statements that defense counsel failed to call Reid as a witness; to use medical records that might have shown that the victim had misled medical personnel during her interviews at the emergency room; and to introduce a statement written by the victim but neither dated nor addressed. The defendant makes no attempt to show how his attorney's conduct fell "measurably below that which might be expected from an ordinary fallible lawyer," *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974), or that "better work might have accomplished something material for the defense." *Commonwealth* v. *Satterfield,* 373 Mass. 109, 115 (1977). The argument falls far short of meeting the requirements of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), and we do not consider it. See *McCone* v. *New England Tel. & Tel. Co.,* 393 Mass. 231, 236 (1984); *Commonwealth* v. *Klein,* 400 Mass. 309, 315-316 (1987); *Baird* v. *Massachusetts Bay Transp. Auth.,* 32 Mass. App. Ct. 495, 499 (1992).

*Judgments affirmed.*