## Commonwealth *vs.* John Carey.

Essex. May 10, 2012. - September 7, 2012.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Armed Home Invasion. Homicide. Attempt. Assault and Battery by Means of a Dangerous Weapon. Assault and Battery. Consent. Evidence,* Photograph, Videotape, Information stored on computer, Inflammatory evidence, Relevancy and materiality.

At the trial of indictments charging the defendant with attempted murder, armed home invasion, assault and battery by means of a dangerous weapon, and assault and battery, in which the defendant contended that the incident constituted a consensual sexual encounter, the judge did not err in declining to instruct the jury that consent was a defense to the defendant's conduct. [383-386]

At the trial of indictments charging the defendant with attempted murder, armed home invasion, assault and battery by means of a dangerous weapon, and assault and battery, in which the defendant contended that the incident constituted a consensual sexual encounter, the judge did not abuse his discretion in admitting in evidence eight photographs depicting nude or partially nude women being strangled seemingly to death, an Internet article regarding the successful appeal of a man convicted of four strangulation murders, and testimony regarding the number of explicit images and Internet searches found on the defendant's home computer, where the photographs (as well as the testimony regarding additional images and searches related to strangulation and asphyxiation stored on the defendant's computer) were sufficiently similar to the way in which the defendant assaulted the victim to be relevant to and probative of his sexual desire and state of mind; where the article similarly related to the defendant's interest in and research of strangulation murders; and where the judge took deliberative and meaningful steps to mitigate the prejudicial effect of the evidence [386-390]; further, although the judge erred in not viewing a ninety-second "video clip" before admitting it in evidence, the error was harmless under either the prejudicial error standard or the substantial risk of a miscarriage of justice standard, where this evidence also was highly probative of the defendant's intent in strangling the victim [390-392].

Indictments found and returned in the Superior Court Department on July 23, 2007.

The cases were tried before *Richard E. Welch, III,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*James L. Sultan* for the defendant.

*Kenneth E. Steinfield,* Assistant District Attorney, for the Commonwealth.

CORDY, J. Based on an assault that occurred during the evening of June 6, 2007, at a home in Hamilton, a jury in the Superior Court convicted the defendant of attempted murder in violation of G. L. c. 265, § 16; armed home invasion in violation of G. L. c. 265, § 18C; assault and battery by means of a dangerous weapon in violation of G. L. c. 265, § 15A (*b*); and assault and battery in violation of G. L. c. 265, § 13A.[1] A divided panel of the Appeals Court affirmed the convictions, *Commonwealth* v. *Carey,* 79 Mass. App. Ct. 587 (2011), and we granted the defendant's application for further appellate review.

On appeal, the defendant contends that the assault constituted a consensual sexual encounter. He thus argues that, in light of the decision of the United States Supreme Court in *Lawrence* v. *Texas,* 539 U.S. 558, 577-578 (2003) (*Lawrence*), the trial judge committed constitutional error by not instructing the jury that consent is a defense to the crimes of armed home invasion and assault and battery by means of a dangerous weapon. The defendant also claims that the judge erred by admitting certain evidence regarding materials retrieved from his home computer. This evidence included eight photographs and one ninety-second "video clip" (video), each depicting a nude or partially nude woman being strangled seemingly to death; an Internet article reporting the successful appeal of a man convicted of four strangulation murders; and testimony regarding the number of images stored on the computer "that were strangulation-oriented or had strangulation themes," as well as testimony about Internet searches and the number of files saved on the computer that concerned asphyxiation.

We conclude that there is no conflict between the reasoning of *Lawrence, supra,* and our prior decisions holding that consent is not a defense to the crimes charged, see *Commonwealth* v. *Mahar,* 430 Mass. 643, 652-653 (2000) (armed home invasion), and *Commonwealth* v. *Appleby,* 380 Mass. 296, 310 (1980) (assault and battery by means of dangerous weapon), and the judge

---

[1] The jury acquitted the defendant on one other indictment charging him with assault and battery.

appropriately instructed the jury on consent. We further conclude that, although admission of the photographs, article, and testimony were proper, the judge's failure to view the video prior to ruling that its probative value outweighed its prejudicial effect was an abuse of discretion. Consequently, we have independently reviewed the content of the video in the context of its use at trial and conclude that it was highly probative of the defendant's motive and intent, the principal issues contested at trial, outweighing its plainly prejudicial effect. Accordingly, we affirm.

*Background.* We recite the essential facts the jury could have found, the details of which are set forth in *Commonwealth* v. *Carey*, *supra* at 588-591.

1. *The Commonwealth's case.* In the spring of 2007, the victim and her husband were separated, the victim living with their twelve year old son in Hamilton, and her husband residing in an apartment in Arlington. The couple were in the process of reconciling, however, and the husband frequently spent time at the Hamilton home. The defendant lived with his girl friend in Braintree; however, the defendant's former wife lived near the victim and was her friend. The defendant performed work on the victim's home and had become acquainted with the victim's husband through their mutual interest in golf. The defendant's daughter was also friendly with the victim's son.

On the evening of June 6, 2007, the victim's son informed her that he needed to bring a Spanish food dish to school the following day. After a brief trip to the market to purchase ingredients, the victim began making a flan in the kitchen on the first floor of her home. Her son was in his second-floor bedroom.

At approximately 9:40 P.M., the victim heard a knock on a glass door that separated the kitchen area from a rear deck. Thinking it was her husband, who had just left to return to his apartment, the victim walked toward the door and recognized instead the defendant. She opened the door for the defendant, who entered and asked for her husband. When the victim informed him that her husband was not there, the defendant responded, in an aggressive tone, "Why would he invite me over for a drink if he's not here?"[2] Frightened, the victim sug-

[2]Both the defendant and the husband testified that, prior to the defendant's

gested that they telephone her husband, but the defendant declined the offer. The victim then asked the defendant, who looked "drunk" and whose breath smelled of alcohol, to leave. She explained that she had to finish making the dessert, and moved toward the glass door through which the defendant had entered the house.

The defendant, however, did not leave. Instead, he attacked the victim, wrapping a necktie around her neck and pulling it from both ends. The victim managed to place her hands between the tie and her throat as the defendant continued to pull on the ligature. The two struggled, and the victim knocked over a heavy chair before falling to the floor.

As the victim "began to fade out," she heard her son run downstairs. The son testified that, on reaching the kitchen area, he saw the defendant choking his mother, who was on the floor and trying to free herself from the defendant's grasp. When the son yelled, "What are you doing?" the victim told him to "[g]et a knife and stab him." The son went to the kitchen, retrieved a small knife, and stabbed the defendant in the back. When he did so, the blade of the knife separated from the handle. The son then dropped the handle, grabbed the defendant, and attempted to pull the defendant away from his mother.

At some point, the defendant released his hold on the victim's throat and advanced toward the son. When he saw that the victim had risen to her feet, however, the defendant moved back toward her and punched her in the forehead and mouth.[3] The victim, her son, and the defendant then ran from the house. The victim ran to one neighboring house, and her son fled to another. The defendant got into his vehicle and drove away.

The victim's neighbors contacted the police soon after the victim and her son arrived at their respective houses. Police officers arrived and examined the area, noticing signs of a struggle in the victim's house and discovering a piece of a necktie on the deck behind it. A deoxyribonucleic acid (DNA) analyst testified at trial that hairs found on the tie matched that of the

---

arrival at the Hamilton home, the defendant had telephoned the husband and learned that he was driving to his apartment in Arlington, not to Hamilton.

[3]The defendant was charged in separate indictments with assault and battery for each of these acts. The jury acquitted him on the indictment stemming from the alleged punch to the mouth. See note 1, *supra.*

victim, and that "handler DNA" discovered on the tie was a mixture from at least three people, including the victim and the defendant.[4]

As part of their investigation, State police conducted a forensic examination on the defendant's home computer. Sergeant Thomas Neff testified that, during the examination, he retrieved from the computer "four hundred or more" images "that were strangulation-oriented or had strangulation themes," as well as the ninety-second video depicting a man strangling a naked woman, apparently to her death. Neff also informed the jury that he found 978 "hits" and forty-seven files related to the term "asphyxia." One of the "hits" led to an article, accessed by the defendant, about a man whose convictions of strangling four women to death were reversed on appeal. Eight photographs, the video, and the article were admitted in evidence, as was testimony concerning the quantity of material retrieved from the defendant's computer.

2. *The defense.* The defendant admitted at trial that he had entered the victim's house and strangled her with a ligature.[5] But he testified that he did so as part of a consensual sexual encounter, and without any intention to harm or kill the victim.

According to the defendant, he and the victim had sexual intercourse twice in February, 2007.[6] He enjoyed asphyxiation as a means toward sexual gratification, and the victim had allowed him to choke her with his hands on one occasion. When he arrived at her home on the evening of June 6, 2007, the defendant intimated his desire for sexual intercourse, and the victim acquiesced. He then placed the tie around her neck and began to pull it, all the while rubbing his genitals against her body to obtain an erection.[7] The defendant admitted that he

---

[4]The deoxyribonucleic acid (DNA) analyst also testified that the victim's husband and her son were excluded as possible sources of the "handler DNA" found on the necktie.

[5]The defendant testified that, although he remembered using a "cloth" ligature, he did not have a "specific recollection" of using the necktie. He nonetheless accepted the results of the forensic testing performed on the necktie, testifying at one point that he had brought the necktie with him to the house.

[6]The victim denied that she ever had sexual intercourse with the defendant.

[7]On cross-examination, the defendant conceded that he did not ask the victim specifically whether he could place the tie around her neck. But, he

continued his efforts even after the victim knocked over a chair, fell to the floor, and warned him that her son was in the house. He claimed to have stopped only when he felt the son's presence behind him, at which point he released the victim and left the house.

3. *Jury instructions on consent.* Defense counsel alluded to the encounter as consensual in his opening statement and stressed that view again during his closing argument, although he did not use it as a basis to request a jury instruction that the victim's consent could act as a defense to the charges of armed home invasion and assault and battery by means of a dangerous weapon. The judge, however, raised the issue of consent during the charge conference, at which time defense counsel conceded that controlling precedent precluded such instructions. See *Commonwealth* v. *Mahar*, 430 Mass. 643, 653 (2000) (*Mahar*); *Commonwealth* v. *Appleby*, 380 Mass. 296, 310 (1980) (*Appleby*). Thus, defense counsel did not object when the judge instructed the jury, both during the initial charge and in response to a question submitted during their deliberations, that "consent is immaterial" to the charge of assault and battery by means of a dangerous weapon.[8] Similarly, defense counsel did not object to the judge's instruction that, with regard to the offense of armed home invasion, "consent cannot be considered legally significant unless the occupant who is allowing the person in has been made aware that the person at the door is armed with a dangerous weapon and is about to commit an assault once inside."

*Discussion.* 1. *Consent as a defense.*[9] The defendant now contends that, in light of the holding in *Lawrence, supra*, the judge erred by not instructing the jury that consent was a defense to his conduct. In that case, the Court deemed unconstitutional a

claimed, when he put it on her, she said, "Let's go," which he took to mean, "Let's get it over with."

[8]After proposing the language with which he intended to answer the jury question, the judge asked defense counsel whether he had an objection. Defense counsel responded, "I'd like to, but I don't think I can."

[9]We acknowledge the Commonwealth's argument that the defendant did not preserve this claim. Given our ultimate conclusion that the judge's instructions on consent were not erroneous, however, we need not resolve the parties' resulting dispute regarding the appropriate standard of review. Cf. *Commonwealth* v. *Randolph*, 438 Mass. 290, 293-297 (2002).

Texas statute that prohibited two persons of the same sex from engaging in consensual sexual intercourse. *Lawrence, supra* at 577-578. Overruling its decision in *Bowers* v. *Hardwick,* 478 U.S. 186 (1986) (*Bowers*), the Court recognized that "liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex," *Lawrence, supra* at 572, and concluded that the due process clause of the Fourteenth Amendment to the United States Constitution provided the petitioners "the full right to engage in their conduct without intervention of the government." *Id.* at 578. The Court also adopted the reasoning of Justice Stevens's dissenting opinion in the *Bowers* case: "[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice." *Lawrence, supra* at 577, quoting *Bowers, supra* at 216 (Stevens, J., dissenting).

Grasping on to this language, the defendant contends that our decision in *Appleby, supra* at 309-311, in which we first ruled that consent was not a defense to a charge of assault and battery by means of a dangerous weapon committed as or as part of sexual activity, is no longer valid. He argues that the *Appleby* holding was motivated by a public policy disapproving of certain consensual sexual behavior and, therefore, represents precisely the type of morals-based judgment the Supreme Court rejected in *Lawrence.* We disagree.

In *Appleby, supra* at 298-299, the victim alleged that the defendant, Appleby, struck him with a riding crop after he served Appleby melted ice cream. Appleby, in turn, testified that, although he did not recall the specific incident at issue, he regularly beat the victim in the context of a consensual sadomasochistic relationship, in which the victim attained sexual gratification from the physical pain Appleby administered to him. *Id.* at 300-302. Consequently, the defendant requested that the judge instruct the jury that "private, consensual sadomasochistic behavior is an 'absolute defense to the charge of assault and battery with a dangerous weapon.' " *Id.* at 312. The judge declined to do so, and the jury convicted the defendant on one indictment charging him with "assault and battery with a dangerous weapon, to wit: a riding crop." *Id.* at 297. See G. L. c. 265, § 15A.

Affirming the conviction on appeal, we rejected Appleby's underlying assertion that, as a matter of law, a party could consent to become the victim of an assault and battery by means of a dangerous weapon. *Appleby*, *supra* at 309-311. We reasoned: "The fact that violence may be related to sexual activity (or may even *be* sexual activity to the person inflicting pain on another . . . ) does not prevent the State from protecting its citizens against physical harm" (emphasis in original). *Id.* at 311. Accordingly, we adhered to the traditional view and fit the facts of the case into the "general rule" that "to commit a battery upon a person with such violence that bodily harm is likely to result is unlawful, and consent thereto is immaterial."[10] *Id.*, quoting *Commonwealth* v. *Farrell*, 322 Mass. 606, 620 (1948).

The defendant's contention that *Lawrence* vitiates the validity of this holding is premised on a fundamental misunderstanding of the *Appleby* decision, as well as a selective misreading of *Lawrence* itself. First, in reaching our conclusion that one could not consent to violent conduct related to or constituting sexual activity, the court recognized the existence of some "right to sexual privacy that citizens enjoy." *Appleby*, *supra* at 310. However, we reasoned that such a right "would be outweighed in the constitutional balancing scheme by the State's interest in preventing violence by the use of dangerous weapons upon its citizens under the claimed cloak of privacy in sexual relations." *Id.* Thus, the foundation from which our decision sprang anticipated the Supreme Court's conclusion in *Lawrence* twenty-three years later that there is some sphere of sex-related activity on which the government should not, and cannot, intrude. See *Commonwealth* v. *Balthazar*, 366 Mass. 298, 301-302 (1974). Although we proceeded to set a boundary to this protected sphere of activity, we did not do so because of any societal disapproval of the underlying sexual conduct, but rather because the government has a legitimate interest in discouraging violent behavior between and against its citizens. See *Appleby*, *supra*, citing *Commonwealth* v. *Farrell*, *supra* at 620-621 (Appleby

---

[10] "[B]odily harm" in this context "has its ordinary meaning and includes any hurt or injury calculated to interfere with the health or comfort of the [alleged victim]. Such hurt or injury need not be permanent, but must, no doubt, be more than merely transient and trifling." *Commonwealth* v. *Farrell*, 322 Mass. 606, 621 (1948), quoting *The King* v. *Donovan*, [1934] 2 K.B. 498, 509.

"was tried for violating a statute that implies, as a matter of public policy, that one may not consent to become a victim of assault and battery with a dangerous weapon"). See also Hanna, Sex Is Not a Sport: Consent and Violence in Criminal Law, 42 B.C. L. Rev. 239, 261 (2001) ("court in *Appleby* goes out of its way to suggest that this is not a case directed against homosexuals, but rather focuses on the nature of the violence itself").

At the core of his argument, the defendant suggests that in *Lawrence*, the Supreme Court articulated a sweeping prohibition against the regulation of consensual sexual conduct or, to state the converse, announced an absolute right of privacy in sexual affairs. As the Supreme Court of Nebraska explained in *State* v. *Van*, 268 Neb. 814, 826 (2004), the Court did no such thing: "The *Lawrence* Court did not extend constitutional protections to *any* conduct which occurs in the context of a consensual sexual relationship. Rather, the Court indicated that State regulation of [private, consensual sexual activity] was inappropriate 'absent injury to a person or abuse of an institution the law protects.' [*Lawrence, supra* at 567]. In addition, it specifically noted that the case it was deciding did not involve 'persons who might be injured [or coerced].' [*Id.* at 578]." We agree with this reading of *Lawrence* and understand the express limitations of that decision not only to align with our conclusion in *Appleby*, but also to anticipate and reject the very argument the defendant raises on appeal. The judge, therefore, appropriately adhered to our precedent. His instructions concerning the issue of consent were and remain correct.[11,12]

2. *Admission of computer materials and related testimony.*

---

[11]Consent to enter a home — in and of itself — is also not a defense to a charge of armed home invasion. *Commonwealth* v. *Mahar*, 430 Mass. 643 (2000) (*Mahar*). In *Mahar, supra* at 650-651, the defense presented evidence that someone inside the home had opened the door and allowed the defendant to enter before the defendant, who was wielding a machete, attacked the home's occupants. We determined that "[w]hen consent to enter is allegedly given to someone, in circumstances such as presented here, the purported consent cannot be considered legally significant unless the occupant has been made aware that the person at the door is armed with a dangerous weapon and is about to commit an assault once inside." *Id.* at 652-653. Thus, "[f]or practical purposes, permissive entry into a dwelling, and entry while armed in order to commit an armed assault, are mutually exclusive concepts because G. L. c. 265, § 18C, implies, as a matter of public policy, that an occupant of a dwelling cannot consent to allow an armed intruder like the defendant inside

The defendant next claims that the judge abused his discretion by allowing the Commonwealth to introduce in evidence the eight photographs and the ninety-second video depicting women in various states of undress being strangled, ostensibly to death; the Internet article regarding the successful appeal of a man convicted of four strangulation murders; and testimony regarding the number of explicit images and Internet searches found on the defendant's home computer. According to the defendant, admission of this inflammatory and explicit evidence was erroneous because it was of minimal relevance to any issue in the case, and any probative value it may have had was outweighed by its prejudicial effect. The defendant also claims that the judge abused his discretion by not watching the video before ruling on its admissibility or allowing the jury to view it.

All evidence, including that of a violent or sexual nature, must meet the threshold test of relevancy; that is, it must have a "rational tendency to prove an issue in the case," *Commonwealth* v. *LaCorte*, 373 Mass. 700, 702 (1977), or render a "desired inference more probable than it would have been without it." *Commonwealth* v. *Fayerweather*, 406 Mass. 78, 83 (1989), quoting *Commonwealth* v. *Copeland*, 375 Mass. 438, 443 (1978). This, however, is only the first step in the inquiry, for even relevant evidence may not be admitted if "its probative value is

to commit an assault." *Id.* at 653, referencing *Commonwealth* v. *Appleby*, 380 Mass. 296, 310 (1980).

[12]That American courts, by and large, have condoned certain harmful and injurious conduct carried out in a sporting contest does not diminish this conclusion. See, e.g., *Commonwealth* v. *Collberg*, 119 Mass. 350, 353 (1876). Cf. *Jaworski* v. *Kiernan*, 241 Conn. 399, 408 (1997) (adopting reckless or intentional conduct standard of care for determining tort liability for injuries sustained during athletic events). To be sure, the leap between that body of law and the issue before us appears short: in both scenarios, an actor may perpetrate a seemingly violent act against his or her partner, but only in one is that actor held legally responsible for the resulting injury. Appearances, however, are often deceiving, as this leap disregards the vast gulf that exists between the organized, regulatory apparatus of sports competitions, and the intensely personal and private negotiations outlining the permissible bounds of sexual conduct. See Hanna, Sex Is Not a Sport: Consent and Violence in Criminal Law, 42 B.C. L. Rev. 239, 247-248, 255-256, 287-290 (2001). See also *Nabozny* v. *Barnhill*, 31 Ill. App. 3d 212, 215 (1975) (referencing existence of "knowledgeable personnel," "a recognized set of rules governing the conduct of the competition," and "safety rule[s]" when assessing legal duty sports players owe one another for purposes of personal injury litigation).

substantially outweighed by the danger of unfair prejudice." Mass. G. Evid. § 403 (2012). We entrust questions of relevancy and prejudicial effect to the sound discretion of the trial judge, whose determinations we will not disturb except for "palpable error." *Commonwealth* v. *Sylvia*, 456 Mass. 182, 192 (2010), quoting *Commonwealth* v. *Simpson*, 434 Mass. 570, 579 (2001).

Here, the judge ruled that, while the computer materials as a whole were "certainly prejudicial to the defendant," they were highly probative of his intent and motive, as well as the victim's alleged consent. With regard to the photographs, article, and testimony, we see no cause to disrupt this ruling. The defendant's intent was the principal issue at trial, as the Commonwealth and the defendant sparred over whether he possessed the specific intent to kill the victim, a necessary element of the attempted murder charge. See *Commonwealth* v. *Franchino*, 61 Mass. App. Ct. 367, 373 n.1 (2004), discussing G. L. c. 265, § 16. Thus, while the defendant alleged that he only strangled the victim as a means toward sexual gratification and without any intent to do her harm, the Commonwealth was entitled to introduce evidence revealing the scope of this fantasy and the likelihood that it included continuing the act to its natural completion — the victim's death.

Although there was scant evidence establishing a temporal connection between the defendant's consumption of these materials and the incident at issue,[13] the contested materials fulfilled precisely this purpose. They were found stored on the defendant's computer, and the jury reasonably could have inferred that he possessed and viewed them. Contrast *United States* v. *Curtin*, 489 F.3d 935, 962 (9th Cir. 2007) (en banc) (Kleinfeld, J., concurring) (admission of five graphic, sexual stories selected from 2,998 single-spaced pages of material found on defendant's personal digital assistant failed relevancy standard of Fed. R. Evid. 401, in part because there was no evidence defendant had read them). The photographs depicted women being strangled

---

[13]Sergeant Thomas Neff, who had conducted the forensic examination of the computer, testified that he had not gathered information concerning the date on which the materials at issue were viewed, although the exhibit submitted on appeal includes the notation "28 May 2007" alongside an Internet search for "asphyxiation." The defendant also testified that he had used his computer to access "pornographic and asphyxia Web sites."

and portrayed them afterward, seemingly lifeless and in sexual positions. These images, and the testimony regarding the additional images and searches related to strangulation and asphyxiation stored on the defendant's computer, were sufficiently similar to the way in which the defendant assaulted the victim to be relevant to and probative of his sexual desire and state of mind. See *Commonwealth* v. *Wallace*, 70 Mass. App. Ct. 757, 765-766 (2007) (where defendant alleged that touching of child victim's breast was accidental, presence of photographs of fully clothed young girls, photographs of nude adult men and women, pornographic magazines containing pictures of teenage girls, and small-sized underwear in his automobile was relevant to and probative of whether touching was intentional). See also *Commonwealth* v. *Scott*, 408 Mass. 811, 820 n.9 (1990), citing *Commonwealth* v. *King*, 387 Mass. 464, 469-472 (1982) (defendant's possession of magazine article about serial killings admissible as evidence of sexual desire and contemplation of modus operandi, where circumstances surrounding manner of death were sufficiently similar). The article similarly relates to the defendant's interest in and research of strangulation murders, even though it reported an incident void of sexual overtones.

To be sure, this evidence was prejudicial to the defendant, insofar as the subject matter explored was explicitly sexual and violent. Yet, that fact alone is not enough to render the evidence inadmissible; to meet that threshold, any prejudicial effect must substantially outweigh the probative value. See *Commonwealth* v. *Olsen*, 452 Mass. 284, 294 (2008) ("That the [contested evidence] may be gruesome or have an inflammatory effect on the jury does not render [it] inadmissible as long as [it] possess[es] evidentiary value on a material matter"). The judge took deliberate and meaningful steps to mitigate the prejudicial effect of the evidence,[14] and appropriately concluded that its probative value, which related to the core issue in dispute, was

---

[14]The judge added certain questions during empanelment designed to seat jurors capable of viewing the evidence dispassionately, and provided cautionary instructions aimed at guiding the jurors toward the "cool, rational" consideration of this evidence both during the trial and in the final charge. See *Commonwealth* v. *Anderson*, 445 Mass. 195, 214 (2005), citing *Commonwealth* v. *Auclair*, 444 Mass. 348, 260 (2005) ("Juries are presumed to follow a judge's instructions"). See also *Commonwealth* v. *Liptak*, 80 Mass. App. Ct. 76, 84 (2011).

comparatively high. Contrast *Commonwealth* v. *Darby*, 37 Mass. App. Ct. 650, 652, 654 (1994) (prejudicial error to admit photograph of male defendant in sexually turgid state where impotence or sexual dysfunction "was not, directly or inferentially, relevant to any issue in the case").

We separately review the judge's decision to admit the ninety-second video. This video generally portrays a nude woman being strangled. More specifically, it depicts a man dressed in black standing behind the woman, who is seated on a chair. The man asks the woman if she is ready for her "surprise," and, when she answers in the affirmative, he takes a cloth strip from his pocket, wraps it around the woman's neck, and strangles her. The woman struggles at first, but less so as time wears on. Her face begins to turn blue and, at the end, she apparently expires.[15] The Commonwealth moved in limine to admit the video. After a hearing at which the Commonwealth described what it depicted and its relevance to the case, the judge ruled it to be admissible. As the defendant notes, the judge did not view the video himself, relying instead on the Commonwealth's description of it to render a ruling on its admissibility.[16] This was error.

"[T]rial judges must take care to avoid exposing the jury unnecessarily to inflammatory material that might inflame the jurors' emotions and possibly deprive the defendant of an impartial jury." *Commonwealth* v. *Berry*, 420 Mass. 95, 109 (1995). Consequently, a judge must engage in a careful and reasoned assessment of any evidence proffered by the government that a criminal defendant contests; only then will the judge truly appreciate the substance and purpose of the evidence, thus enabling him fairly to balance the submission's prejudicial impact against its probative value. See *United States* v. *Liefer*, 778 F.2d 1236, 1241 (7th Cir. 1985) ("trial court must carefully assess all evidence offered by the government . . . to ensure

---

[15]The defendant testified that he was familiar with the woman featured in the "video clip" (video), who was the owner of an asphyxiation-themed Web site and performed in many of its videos.

[16]The defendant does not dispute the accuracy of the Commonwealth's description. The defendant did not request that the judge review the video before ruling on its admissibility, nor did he object when the judge ruled without doing so.

that . . . [it] has probative value that is not substantially out-weighed by the danger of unfair prejudice to the defendant").

Although there may be instances where a judge can discharge this duty without reviewing the contested evidence personally, this is not such a case. See *United States* v. *Loughry*, 660 F.3d 965, 971 (7th Cir. 2011), citing *United States* v. *Gonzalez-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005) (positing that "[t]here may be cases where the probative value of the evidence is so minimal that it will be obvious to the court that the potential prejudice to the defendant substantially outweighs any probative value the evidence might have"). As the dissenting Justice in the Appeals Court so aptly noted, there is a particular nuance and impression of watching a video of the strangulation "death" of a woman that the Commonwealth's description, however ac-curate, simply could not capture. See *Commonwealth* v. *Carey*, 79 Mass. App. Ct. 587, 597-598 (2011) (Grainger, J., dissenting). Given the highly inflammatory nature of the evidence, of which he was aware, the judge ought to have recognized the great potential for prejudice it carried and taken a moment to familiar-ize himself with its contents. Without having done so, the judge simply "could not have fully assessed the potential prejudice to [the defendant] and weighed it against the evidence's probative value." *United States* v. *Loughry, supra* at 972. See *United States* v. *Curtin*, 489 F.3d 935, 957-958 (9th Cir. 2007) ("inflam-matory . . . and reprehensible nature of [sexually explicit] stories, although generally relevant, is such that a district court . . . must know precisely what is in the stories in order for its weighing discretion to be properly exercised and entitled to deference on appeal"; "[o]ne cannot evaluate in a [Fed. R. Evid. 403] context what one has not seen or read"). This failure is itself an abuse of discretion. See *Commonwealth* v. *Fredette*, 56 Mass. App. Ct. 253, 259 n.10 (2002).

This conclusion, however, does not end our inquiry. Rather, it requires us to evaluate whether the error in failing to view the video personally before ruling on its admissibility prejudiced the defendant, if his objection was preserved, see *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), or posed a substantial risk of a miscarriage of justice, if not. See *Commonwealth* v. *Fredette, supra* at 258-259. Because the defendant did not

explicitly request that the judge watch the video himself and failed to raise this precise issue before the Appeals Court,[17] the Commonwealth strenuously urges us to consider the defendant's argument under the less stringent standard of review. The defendant, in contrast, treats the evidentiary issue as though it were preserved and references the "prejudicial error" standard in his brief before us. See *Commonwealth* v. *Flebotte, supra.*

Because the error does not warrant reversal under either standard, we need not resolve this dispute. We have reviewed all of the disputed evidence and concur that the video, like the photographs, article, and Internet search testimony, was highly probative of the defendant's intent in strangling the victim. Granted, it posed a greater risk of prejudicing the defendant, but that risk did not subsume the probative value. The judge provided a curative instruction before playing it, and its content was confined to the exact act with which the defendant was charged. Contrast *United States* v. *Curtin, supra* at 938, 956-959 (although evidence relevant, admission of graphic stories portraying "adults having sex with children" constituted reversible error where judge did not read stories before admitting them and stories contained graphic descriptions of "excrescence" of different order of magnitude than acts charged). The video, and all of the contested evidence, illuminated the defendant's state of mind. Thus, it was admitted for the legitimate purpose of establishing the probability that the defendant possessed the specific intent to kill the victim, and not merely to dupe the jury into believing he was "a lewd man, and . . . that a man of his character would be likely to commit the crimes charged." *Commonwealth* v. *LaSota*, 29 Mass. App. Ct. 15, 27 (1990), quoting *Commonwealth* v. *Ellis*, 321 Mass. 669, 670 (1947).[18]

*Judgments affirmed.*

---

[17]The issue was raised by the Appeals Court's dissenting Justice. *Commonwealth* v. *Carey*, 79 Mass. App. Ct. 587, 597-599 (2011) (Grainger, J., dissenting).

[18]Although the admission of the video added to the over-all quantity of potentially inflammatory material provided to the jury, it did not render this grouping of evidence unduly repetitive or cumulative. Each item — the eight photographs, the video, the article, and the testimony — depicted the substance of the defendant's sexual desire in a different light, and together, they revealed

the depth of his interest in, and inquiry into, asphyxiation. As a whole, they constituted a relatively small number of exhibits, and the jury were not provided with the video during their deliberations. Contrast *Commonwealth* v. *Jaundoo*, 64 Mass. App. Ct. 56, 59, 62-63 (2005) (prejudicial error to admit "great quantity of material," including pornographic videotape, evidence bag containing seventy-seven pornographic images, and several pornographic magazines, all of which were given to jury for perusal in jury room and none of which had any "direct bearing on the complainant's testimony").