NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-09203


COMMONWEALTH  vs.  ERIC SNYDER.



Norfolk.     May 6, 2016. - September 8, 2016.

Present:  Gants, C.J., Cordy, Duffly, Lenk, & Hines, JJ.[1]


Homicide.  Evidence, Expert opinion, Identification, Relevancy
     and materiality.  Witness, Expert.  Practice, Criminal,
     Capital case, Sentence, Execution of sentence.




Indictment found and returned in the Superior Court
Department on February 8, 2000.

The case was tried before Robert A. Mulligan, J.


Dana Alan Curhan (Victoria L. Nadel & Roger Witkin with
him) for the defendant.
Stephanie Martin Glennon, Assistant District Attorney, for
the Commonwealth.


LENK, J.  In March, 2003, the defendant was convicted by a

Superior Court jury of murder in the first degree, on a theory

of deliberate premeditation, in the 1994 shooting death of

_____

[1] Justices Cordy and Duffly participated in the deliberation
on this case prior to their retirements.

Joseph O'Reilly in Quincy.  On direct appeal from that conviction, the defendant argues that the judge erred in not allowing the admission of testimony by an expert on eyewitness identification, and in allowing the admission of testimony concerning a stocking cap with eye holes that was seized from a vehicle the defendant was driving several months after the shooting.  The defendant also seeks relief under G. L. c. 278, § 33E, and asks that his sentence be revised to run concurrently with an unrelated Federal sentence he was serving at the time of his conviction.  Having reviewed the record, we affirm the conviction and discern no reason to exercise our authority to grant extraordinary relief.[2]  Because the defendant's motion to revise and revoke his sentence was timely filed on the day of sentencing, but has not been acted upon, we remand the matter to the Superior Court for consideration of his pending motion.

Facts.  We recite the facts the jury could have found, reserving certain details for later discussion.  At approximately 6:45 P.M. on September 29, 1994, Joseph O'Reilly was shot to death outside his girl friend's apartment on Quincy

---

[2] Ordinarily our review of the record pursuant to G. L. c. 278, § 33E, would include a review of all trial exhibits. Despite exhaustive search efforts by the Superior Court clerk's office in Norfolk County, however, the exhibits from the trial in this case cannot be located.  The exhibits listed and described in the trial transcript do not seem pertinent to the issues raised at oral argument or in the briefs.  Of necessity, we confine our review to the record before us.

Shore Drive in Quincy.  Police quickly responded to the scene.
The victim's girl friend, Patricia Licciardi, reported hearing
someone yell, "Hey, O'Reilly, we got you now," followed by four
to five gunshots.  One of Licciardi's neighbors informed police
that she had seen two white males in their twenties or early
thirties in flight immediately after the shooting.

Initial efforts by police to locate the attackers were
unsuccessful, but interviews with area residents indicated that
two white males had spent the later afternoon in the vicinity of
the Neponset River Bridge, which overlooked Licciardi's
apartment.[3]  A police dog tracked a scent from the scene of the
shooting to the bridge.  The dog also alerted to a strong scent
in the yard outside Licciardi's apartment, indicating that at
least one person had been standing there for an extended period.

_____

[3] Quincy Shore Drive meets the Neponset River Bridge,
passing over Commander Shea Boulevard.  A set of stairs leads
from Commander Shea Boulevard up to the bridge.  One witness
reported seeing a man crouched down on those stairs, making eye
contact with another man across Quincy Shore Drive, at
approximately 5:30 P.M. on the day of the shooting.  Another
witness recalled seeing two men standing at the top of the
stairs at 6 P.M.  That individual had never seen anyone else use
the stairs, despite having lived in the area for thirty years.
A third individual similarly described that she had been
"throw[n] . . . off" by seeing two men talking with each other
near the stairs at approximately 6 P.M.  Patricia Licciardi's
landlord also observed two men standing on the bridge at
approximately 6 P.M., looking towards Licciardi's apartment.
One of Licciardi's neighbors reported seeing two men walking in
the direction of Licciardi's apartment at approximately 6:15
P.M.  She had seen one of the men nearby earlier in the
afternoon, between 4 P.M. and 4:30 P.M.

From early in the investigation, police suspected the defendant of involvement in the shooting, because of a contentious history with the victim. Before being incarcerated in 1988, the victim had been involved romantically with a woman named Lisa Dinsmore, with whom he had a son.[4] In 1990, while the victim was in prison, the defendant -- then on parole -- began dating Dinsmore, and lived intermittently with her and her children, including the victim's son. Beginning in 1990 and continuing at least through 1992, the victim undertook extreme measures to interfere with the defendant's relationship with Dinsmore and also with the victim's son.[5] As a result of the victim's efforts, by June, 1991, the defendant was required to

---

[4] Lisa Dinsmore married and changed her name prior to the defendant's trial.

[5] Even before the defendant began living with Dinsmore, the victim had been writing her threatening letters. After the defendant moved in with Dinsmore, however, the victim started sending her one to two threatening letters per day. In one of those letters, the victim drew pictures of Dinsmore's children, dead. Beginning approximately in 1990, the victim also sent multiple letters to Dinsmore's brother. After opening the first of those letters and discovering that it contained threats directed against Dinsmore and the defendant, Dinsmore's brother marked additional letters "return to sender" without opening them. In 1990 or 1991, the victim falsely reported to police a break-in at Dinsmore's apartment while the defendant was at home, apparently in order to jeopardize the defendant's parole status. At some point, the victim also informed the Department of Social Services that the defendant had molested his son. In July and August, 1991, the victim contacted two different parole officers to report that the defendant had violated the terms of his parole. By early 1992, the victim also had sent the defendant a forged medical document indicating that the defendant had tested positive for human immunodeficiency virus.

move out of Dinsmore's apartment as a condition of his parole.[6]

In May, 1992, the victim wrote a letter to the defendant's half-brother, David Piscatelli, in which he threatened to kill the defendant, Piscatelli, other members of the defendant's family, and Dinsmore. In response to that letter, both the defendant and Piscatelli sought criminal complaints against the victim. At some point in 1992, the victim's mother accused the defendant of stalking her, and the defendant's parole was revoked. The victim then arranged to have his mother send the defendant contraband in prison, in an effort to complicate the defendant's efforts at having his parole reinstated.

The defendant described the victim as a "puke rat," and expressed to Dinsmore that he would "like to kill him." After the prison contraband incident, the defendant told Arnold Emma, an inmate with whom he was acquainted, that he would "take care of" his issues with the victim. The victim apparently anticipated some form of retaliation: upon his release from prison,[7] the victim kept several firearms in Licciardi's

---

[6] Evidence that the defendant was on parole and the victim was trying to put him back in jail was introduced by the Commonwealth in support of its theory of the defendant's motive to kill the victim. The judge gave a limiting instruction on the use of this testimony. As part of that instruction, the jury were told not to consider the defendant's criminal record as indicative of a propensity to commit the offense charged.

[7] The defendant was released from prison prior to the victim's release.

apartment, ostensibly for protection from the defendant.[8] The victim also went regularly to the windows of the apartment to see if the defendant was hiding nearby. At the time of his death, the victim was carrying documents related to the criminal complaints that the defendant and Piscatelli had filed against him.

Other evidence indicated that the defendant followed through on his expressed interest in killing the victim. The day after the shooting, William Petras, who worked at a dry cleaning store across the street from Licciardi's apartment, identified the defendant from an array of fifty photographs. According to Petras, the defendant had stopped by the store and asked to use the telephone at approximately 1:30 P.M. on the day of the shooting. In addition, Emma eventually implicated the defendant more directly in the shooting.[9] According to Emma, while incarcerated for an unrelated conviction in April, 1995,

---

[8] Investigators determined that the victim's firearms were not used in the shooting.

[9] Arnold Emma first provided information about the defendant's role in the shooting to a State police trooper after Emma had been released from prison in 1995, and had been arrested again on a new charge. Although Emma hoped to obtain a reduced bail in exchange for the information, at trial he denied actually receiving any promise, reward, or inducement. The prosecutor who prosecuted Emma on the new charge was unaware that Emma had provided any information to police.

the defendant had gloated to him about killing the victim.[10]  The

defendant explained that he had had to kill the victim so that

the victim did not kill him first.

Prior proceedings.  On February 8, 2000, a Norfolk County

grand jury returned an indictment charging the defendant with

murder in the first degree.  See G. L. c. 265, § 1.  Although a

warrant issued the same day, at that time the defendant was

incarcerated in a Federal prison in Pennsylvania as a result of

a conviction on a Federal firearms charge.[11]  In March, 2002, an

interstate detainer agreement finally issued authorizing the

defendant's transfer to Massachusetts for trial.  Before trial,

the judge allowed the defendant's motion for funds to obtain an

eyewitness identification expert.  The defendant then filed

---

[10] Emma explained that the defendant told him that he had
learned where the victim lived, and visited the area several
times to plan his attack.  The defendant added that the place
was hard to access, and required climbing over a wall to get in
and out safely.  When he and an unidentified associate went to
"do" the victim, they parked nearby and hid behind a set of
bushes.  After the victim pulled into the driveway, they came
out of hiding, wearing ski masks.  The defendant shouted,
"Payback," and started shooting.  He and his associate then fled
the scene.

[11] The defendant was convicted under 18 U.S.C. § 922(g)(1),
for being a felon in possession of a firearm and ammunition, and
ultimately was sentenced as an armed career criminal, pursuant
to Federal sentencing guidelines, to twenty-two years in prison.
See United States v. Snyder, 235 F.3d 42, 44-45 (1st Cir. 2000),
cert. denied, 532 U.S. 1057 (2001).  The defendant was found
with the firearm and ammunition at issue in the Federal case
several months after the victim had been killed.  That firearm
was determined not to be the weapon used to shoot the victim.
See note 26, infra.

several additional motions, including a motion in limine to allow testimony from an eyewitness identification expert, and a motion for an evidentiary hearing regarding the expert's qualifications; both of those motions were denied.  Trial commenced in February, 2003.[12]

The defendant's theory of the case was one of mistaken identity.  The defense cross-examined Petras and Emma extensively, and called an alibi witness who testified that the defendant had been at a dog racing track in Raynham at the time of the shooting.  The defendant filed motions for required findings of not guilty at the close of the Commonwealth's case and at the close of all the evidence; the motions were denied.  On March 10, 2003, after deliberating for three days, the jury found the defendant guilty of murder in the first degree on a theory of deliberate premeditation.  He was sentenced to life in prison without the possibility of parole, to run from and after his Federal sentence.[13]

---

[12] Before trial, the defendant waived his speedy trial rights under the Interstate Agreement on Detainers, St. 1965, c. 892, § 1, art. IV (c).  On appeal, the defendant does not assert that any of his speedy trial rights were violated, and, on the record before us, we discern no grounds for relief on that basis pursuant to G. L. c. 278, § 33E.

[13] Although the defendant filed a timely notice of appeal in March, 2003, inexcusable delay on the part of the defendant's appellate counsel led this court on September 18, 2015, to order him replaced by an attorney to be assigned by the Committee for Public Counsel Services.  The order noted that "any motion for a

Discussion. 1. Eyewitness identification expert. Before trial, the defendant filed a motion in limine to allow expert testimony by Dr. Steven D. Penrod, an eyewitness identification expert, as well as a motion for an evidentiary hearing pursuant to Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-595 (1993), and Commonwealth v. Lanigan, 419 Mass. 15, 26 (1994), to establish the scientific validity of Penrod's opinion.[14] The judge denied both motions on the day of the hearing on the motions, with minimal explanation.[15]

At trial, Petras testified regarding his identification of the defendant from the photographic array. Another witness,

_____

new trial that is filed before this direct appeal is decided will be considered after the direct appeal." Replacement counsel filed the defendant's brief in January, 2016, and oral argument was heard in May, 2016.

[14] Juries today are instructed extensively regarding the limitations of eyewitness identifications. See Commonwealth v. Gomes, 470 Mass. 352, 376-377 (2015). Such instruction, however, was not required at the time of the defendant's trial. See id. at 376 ("We intend the new instruction to have no retroactive application"). See also Commonwealth v. Rodriguez, 378 Mass. 296, 310-311 (Appendix) (1979) (eyewitness identification instructions in effect at time of defendant's trial).

[15] At the hearing on the motions, defense counsel argued, "[I]f the Court is not inclined to hear Dr. Penrod today -- if the Court's inclination today is not to allow for Dr. Penrod to testify at trial, then the defendant would certainly argue for and I have a written motion for requesting a [Daubert] hearing in order to qualify him as an expert and discuss the issue without a jury." The judge replied, "Fine. Motion for expert on eyewitness identification and the reliability of eyewitness identification is denied." The motion for an evidentiary hearing was denied the same day, in a one-word written order.

Carol O'Mahony, also identified the defendant, for the first time, in the court room. When interviewed by police on September 31, 1994, O'Mahony told police she had seen two men in the vicinity of the Neponset River Bridge on the day of the shooting. She was shown the same photographic array that had been shown to Petras, but she did not recognize any of the men depicted.[16] On direct examination, O'Mahony testified that she did not see either of the men in the court room that she had seen on the day of the shooting.[17] On cross-examination, however, she identified the defendant as one of those men. After this testimony, the defendant renewed his motion in limine to allow Penrod to testify as an eyewitness identification expert, without success.

The defendant argues that the judge erred in not allowing Penrod to testify. As has become increasingly clear, "common sense is not enough to accurately discern the reliable eyewitness identification from the unreliable." Commonwealth v. Gomes, 470 Mass. 352, 366 (2015). Expert testimony may be an

---

[16] Carol O'Mahony selected photographs of men she thought had a similar complexion to the complexion of one of the men she had seen, but did not make a specific identification. She told police that she thought she would be able to identify the man if she saw him in person.

[17] See Commonwealth v. Collins, 470 Mass. 255, 266 (2014) (requiring Commonwealth on prospective basis to move in limine to allow in-court identification testimony by eyewitness who "has not made an unequivocal positive identification of the defendant before trial").

important means of explaining counterintuitive principles regarding the reliability of eyewitness identifications, or of challenging such principles. See id. at 365-366.[18] Eyewitness identification expert testimony also may be an important means of explaining how other variables relevant in a particular case can affect the reliability of the identification at issue. See id. at 378. Nonetheless, there are some circumstances in which such testimony permissibly can be excluded. See Commonwealth v. Watson, 455 Mass. 246, 257 (2009) (admission of eyewitness identification expert testimony "is not admissible as of right, but is left to the discretion of the trial judge"). A judge must consider whether "the tests and circumstances" on which the expert's opinion rests "provide a basis for concluding that the opinion is reliable." Commonwealth v. Santoli, 424 Mass. 837, 844 (1997), and cases cited. In addition, "the offered opinion must be relevant to the circumstances of the witness's identification." Commonwealth v. Santoli, supra. Furthermore, "the judge must conclude that the subject of the opinion is one on which jurors need assistance and can be helped, and will not be confused or misled, by the expert's testimony." Id.

---

[18] See also Supreme Judicial Court Study Group on Eyewitness Evidence: Report and Recommendations to the Justices (July 25, 2013), http://www.mass.gov/courts/docs/sjc/docs/eyewitness-evidence-report-2013.pdf [http://perma.cc/WY4M-YNZN].

In reviewing the judge's assessment for abuse of discretion, see Commonwealth v. Watson, supra, we consider whether the judge made a "clear error of judgment in weighing" the relevant factors "such that the decision falls outside the range of reasonable alternatives" (citation omitted). See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014), and cases cited. The parties do not dispute that Penrod's opinions regarding eyewitness identifications were grounded in reliable scientific evidence. Nonetheless, the judge reasonably could have determined that Penrod's opinions were not relevant to the circumstances of the identifications at issue, and would not aid the jury.

The motion in limine indicated that Penrod's testimony would aid the jury in assessing the reliability of Petras's identification of the defendant from the photographic array[19] by describing "factors affecting eyewitness identification including, but not limited to, the relationship between the passage of time and the recall of the event, the effect of post-identification events on memory, misidentification problems associated with photo spreads and photo arrays, including subtle cues and hints by the administrator(s), and how the confidence the identifier feels influences jury perception, even when the

---

[19] The motion in limine did not address Carol O'Mahony's identification of the defendant, which was made for the first time during trial.

identifier is mistaken." Yet Petras first identified the defendant on the day after the shooting, apparently without any intervening events that could have affected his identification.[20] In such circumstances, the judge reasonably could have determined that the proffered expert testimony regarding the effects of the passage of time and postidentification events was irrelevant.

The judge likewise reasonably could have determined that expert testimony regarding the hypothetical deficiencies of photographic arrays was not relevant, in light of his express prior determination that such deficiencies were not present in this case. On January 23, 2003, while the defendant's motion to introduce expert testimony was under advisement, the judge issued findings in connection with the defendant's motion to suppress Petras's identification from the photographic array. In a written memorandum of decision denying the motion, the judge concluded that "[t]here was nothing in the array itself or in the procedure which was suggestive in the slightest of the

---

[20] Contrast Commonwealth v. Johnson, 470 Mass. 389, 393 (2015) (witness unable to identify defendant in lineup eighteen days after crime, by which time defendant had changed his hairstyle).

defendant."[21]  The judge reasonably could have relied on that conclusion in resolving not to allow Penrod's testimony.

It also was reasonable to conclude that testimony concerning the effect on the jury of the witness's expressed confidence was not relevant based on the anticipated testimony. The judge noted during the hearing on the motion to introduce expert testimony that the Commonwealth would not be permitted to question Petras concerning his degree of confidence in his identification.  See Commonwealth v. Santoli, supra at 845-846 (eyewitness's degree of confidence is not reliable indicator of accuracy of identification).  Petras ultimately volunteered during his testimony that he was not wholly confident in the accuracy of his identification.[22]  Given Petras's own doubts,

---

[21] According to the judge's findings, the array that police showed Petras comprised fifty color photographs of "the same size, shape[,] clarity of color[,] and definition," showing frontal and profile views of the defendant and forty-nine other "dark haired young men," approximately thirty-five of whom appeared to be Caucasian and twelve to sixteen of whom appeared to be Hispanic.  The judge further found that Petras was by himself during his interview with police, and that he was shown the photographs in a random order.  In addition, the judge found that the interviewers did not react in a confirmatory manner when Petras selected the defendant's photograph.

[22] Petras stated that he was "pretty sure" that the photograph he selected was of the person he had seen on the afternoon of the shooting.  In addition, when asked during direct examination whether the person he had seen in the store was present in the court room, Petras stated that he was "not a hundred percent sure."  He explained,

however, it is not clear how expert testimony calling into question the reliability of an eyewitness's expressions of confidence would have altered the jury's assessment of Petras's identification. The judge reasonably could have denied the renewed motion in limine on that basis.

The judge's decision not to allow Penrod's testimony after O'Mahony's identification of the defendant on cross-examination also was not error. The motion to introduce expert testimony indicated that Penrod was prepared to testify regarding pretrial identifications by means of a photographic array, not in-court showup identifications. See Commonwealth v. Collins, 470 Mass. 255, 262 (2014) (noting differences between pretrial identifications and in-court showup identifications). In any event, O'Mahony's identification was made for the first time approximately eight and one-half years after the shooting, and contradicted her earlier testimony on direct examination. The judge reasonably could have concluded that the jury were able to assess the reliability of such an identification without the aid of Penrod's testimony. In short, the judge did not make "a

---

"I'm looking at the -- I'm looking over here, because I know this is the [d]efendant. And he looks different from those days, you know. It could be. It could be. If you showed me the other picture, you know. He looks broader now. He looks broader, and he looks like his hair is different. It could be."

The defendant did not object to, or move to strike, Petras's assessments of his confidence in his identification.

clear error of judgment in weighing the factors relevant to the decision" (quotation and citation omitted).  See L.L. v. Commonwealth, supra at 185 n.27.

Moreover, even if the judge had abused his discretion in declining to allow Penrod's testimony, any error would not have been prejudicial.  See Commonwealth v. Cassidy, 470 Mass. 201, 210 (2014).  The defense cross-examined both Petras and O'Mahony extensively regarding their identifications, and the jury were instructed specifically to scrutinize with "great care" the circumstances in which those identifications were made.[23]

Indeed, the jury in this case were made aware of the limitations

_____

[23] The jury were instructed to consider "whether you are satisfied that the identification made by the witness later was a product of his or her own recollection."  The judge added,

"I am referring now to an identification made photographically by Mr. Petras, and an identification made in court in this case by Ms. O'Mahony, and any testimony about similarities or dissimilarities that you heard in this case, dissimilarities of [the defendant], similarities of [the defendant].  If the identification by the witness may have been influenced by the circumstances under which the person, the defendant in this case was presented to him or her for identification, you should scrutinize that identification with great care.  You may also consider the length of time that lapsed between the occurrence, that is the afternoon of September 29, 1994, and the opportunity of the witness to see and identify the defendant as a factor bearing on the reliability of the identification.  You may also take into account that an identification made by a person by picking the defendant out of a group of similar-looking individuals is generally more reliable than an identification that results from a presentation of the defendant alone to a witness.  When I say 'out of a group of similar-looking individuals,' I'm talking about either alive or photographically."

of eyewitness identifications -- at one point, a witness incorrectly identified the foreperson of the jury as having been present in Quincy on the day of the shooting.  Furthermore, this case did not turn on the identifications by Petras and O'Mahony.  Neither Petras nor O'Mahony placed the defendant directly at the scene of the crime,[24] and Petras's identification was consistent with the defendant's alibi.[25]  Emma testified that the defendant told him in considerable detail how he had shot the victim, and was cross-examined exhaustively regarding that testimony.  Moreover, other witnesses described extensively the defendant's motive to kill the victim, who had gone to great lengths to cause him distress.  In such circumstances, there is no reasonable possibility that the judge's decision not to allow the proffered expert testimony affected the verdict.  See Commonwealth v. Alphas, 430 Mass. 8, 23 (1999).

---

[24] See Commonwealth v. Collins, 470 Mass. 255, 265 n.15 (2014), citing Commonwealth v. Crayton, 470 Mass. 228, 242 n.17 (2014) (noting possible distinction between reliability of identification by eyewitness who was present during commission of crime and identification by eyewitness who was "not present during the commission of the crime but who may have observed the defendant before or after the commission of the crime, such as where an eyewitness identifies the defendant as the person he or she saw inside a store near the crime scene a short time before or after the commission of the crime").

[25] As noted, Petras recalled seeing the person he identified as the defendant at approximately 1:30 P.M. on the day of the shooting.  According to the defendant's alibi, the defendant did not leave for Raynham that day until between 2 P.M. and 3 P.M.

2.  <u>Admission of stocking cap testimony</u>.  When recounting the defendant's jailhouse confession, Emma testified that the defendant had told him he was wearing a ski mask at the time of the shooting.  The Commonwealth then introduced, over objection, testimony from a police officer who found an orange stocking cap with eye holes cut out of it during a search of a vehicle the defendant was driving several months after the shooting.[26] Although the cap was not admitted in evidence, at the Commonwealth's request, the officer put his fingers through the eye holes and showed the cap to the jury.  The defendant argues that the officer's testimony, including the demonstration, should not have been admitted, because it constituted impermissible evidence that the defendant had used the stocking cap to commit other crimes.  The defendant further argues that the admission impermissibly suggested, without foundation, that the cap was the ski mask mentioned by Emma in connection with the shooting.

The defendant does not make clear why his possession of the stocking cap would have indicated to the jury that he was involved in other criminal activity besides the charged offense. Even assuming that the jury could have drawn such an inference,

---

[26] A firearm and a roll of duct tape were found together with the stocking cap, in a locked briefcase in the trunk of the vehicle.  The defendant filed a motion to suppress the firearm, which was allowed.  The officer did not testify about the discovery of the duct tape.

however, evidence of a defendant's involvement in uncharged criminal activity "may be admissible if relevant for some other purpose" than to show the defendant's bad character or propensity to commit the charged offense. See Commonwealth v. Corliss, 470 Mass. 443, 450 (2015) (citation omitted). To be relevant, evidence "must have a rational tendency to prove an issue in the case . . . or render a desired inference more probable than it would have been without it" (quotations and citations omitted). Commonwealth v. Carey, 463 Mass. 378, 387 (2012). Although the neighbor who saw two men fleeing the scene did not report that they were wearing masks, the officer's testimony regarding the cap corroborated Emma's account of what the defendant told him about the shooting.

Furthermore, "[w]hether proffered evidence is relevant and whether its probative value is substantially outweighed by its prejudicial effect are matters entrusted to the trial judge's broad discretion and are not disturbed absent palpable error" (quotation and citation omitted). Commonwealth v. McGee, 467 Mass. 141, 156 (2014). Because the testimony had at least "a rational tendency" to render Emma's account more probable, its admission was not an abuse of discretion. See Commonwealth v. Carey, supra.

3. Relief pursuant to G. L. c. 278, § 33E. The defendant argues that this court should use its power under G. L. c. 278,

§ 33E, to reverse his conviction in the interest of justice.  He emphasizes that Petras's identification of him as being in Licciardi's neighborhood almost six hours before the shooting was consistent with his alibi, and therefore did not prove that he actually played a role in the shooting.  The defendant argues further that there is reason to distrust Emma's account of his jailhouse confession.  Nonetheless, the defendant concedes that, viewed in the light most favorable to the Commonwealth, the evidence was sufficient to support a finding of guilt beyond a reasonable doubt.  General Laws c. 278, § 33E, "does not . . . convert this court into a second jury, which must be convinced beyond a reasonable doubt of the guilt of a defendant by reading the reported evidence, without the advantage of seeing and hearing the witnesses" (citation omitted).  Commonwealth v. Franklin, 465 Mass. 895, 916 (2013).

In the alternative, the defendant asks that his conviction be reduced to a lesser degree of guilt because of the extent to which the victim's efforts to harass the defendant brought about his own demise.  The victim's efforts were not so immediate to the shooting, however, as to mitigate the offense as a matter of law, see Commonwealth v. Keohane, 444 Mass. 563, 567 (2005), and we decline to reduce the defendant's conviction to a lesser degree of guilt by means of our extraordinary powers pursuant to G. L. c. 278, § 33E.

The defendant further requests that we exercise our authority under G. L. c. 278, § 33E, to revise his sentence to run concurrently with the Federal sentence for which he was incarcerated at the time of his conviction in this case. As noted, the trial judge ordered that the mandatory life sentence be imposed from and after the defendant's Federal sentence. The judge also directed the defendant, however, to file a motion to revise and revoke the sentence. The judge apparently planned to revisit the timing of the sentence after the issuance of the rescript in this case.[27] The defendant filed a motion to revise and revoke, and an affidavit explaining the basis for that

---

[27] The judge explained,

"Here's what I'm going to do. I'm going to make it a consecutive sentence now. And after the rescript, file a motion to revise and revoke on that one issue only: consecutive or concurrent. And after the rescript comes down from the Supreme Judicial Court, I'll make the decision then.

". . .

"The victim impact statement will be marked and placed in the file of the case. The sentence, of course, is statutory, mandatory. So the impact statement, although I have read it, can have no [effect] on the sentence I have imposed. So impose that consecutively with the sentence now being served.

"You file the revise and revoke, and I will take up that issue after the decision by the Supreme Judicial Court."

motion,[28] pursuant to Mass. R. Crim. P. 29, 378 Mass. 899 (1979), on the day he was sentenced. The judge since has retired, and the motion remains pending.

General Laws c. 278, § 33E, does not give this court independent authority to revise and revoke the timing of sentences.[29] Rule 29(a), by contrast, allows a trial judge to revise or revoke a sentence upon "the written motion of a defendant filed within sixty days after the imposition of a sentence, [or] within sixty days after receipt by the trial court of a rescript issued upon affirmance of the judgment . . . if it appears that justice may not have been done." Accordingly, we remand the case to the Superior Court for a ruling on the defendant's pending motion to revise and revoke. While rule 29(a) "contains strict time limits," see Commonwealth v. Costa, 472 Mass. 139, 148 n.5 (2015), the defendant timely filed his motion to revise and revoke the sentence, as directed by the trial judge. The motion should be considered.

---

[28] In the affidavit, defense counsel stated, "I believe that after there has been review by the Supreme Judicial Court, the [Superior] Court ought to take a second look at this case on the issue of whether the defendant should receive a 'from and after' sentence or a concurrent sentence."

[29] See G. L. c. 278, § 33E ("[T]he court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require [a] order a new trial or [b] direct the entry of a verdict of a lesser degree of guilt, and remand the case to the [S]uperior [C]ourt for the imposition of sentence" [emphasis added]).

4.  <u>Conclusion</u>.  The judgment of conviction is affirmed. The matter is remanded to the Superior Court for consideration of the defendant's pending motion to revise and revoke the sentence.

<u>So ordered</u>.